## WEST ET AL. *v.* CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF BALTIMORE.

No. 648.   Argued April 10, 11, 1935.—Decided June 3, 1935.

664

*Messrs. Richard F. Cleveland* and *John Henry Lewin,* with whom *Mr. Herman M. Moser* was on the brief, for appellants.

*Mr. Charles McHenry Howard,* with whom *Messrs. Raymond S. Williams, R. A. Van Orsdel, T. Baxter Milne, C. M. Bracelen,* and *John H. Ray* were on the brief, for appellee.

By leave of Court, *Messrs. Randolph Barton, Jr.,* and *Forrest Bramble* filed a brief on behalf of the Retail Merchants Association of Baltimore, as *amicus curiae.*

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Early in 1933 the Public Service Commission of Maryland undertook an investigation of the rates and charges of the Chesapeake and Potomac Telephone Company of Baltimore, and after extended hearings entered an order

November 28, 1933, directing the company to put into effect January 1, 1934, reductions in its rates, sufficient to diminish annual net income by $1,000,000. The company filed a bill in the District Court for temporary and final injunction; the application for interlocutory relief was heard by a court of three judges. A stipulation was made that the cause should be treated as upon final hearing and a decree was entered enjoining enforcement of the order.[1]  This appeal challenges the court's action.

The Commission determined the value of the property at December 31, 1932, as $32,621,190; estimated the net revenue for 1934 at $3,353,793; allowed for reasonable return 6% on value,—$1,957,271,—which the estimated revenue would exceed by $1,396,522. In view of the rise of the general price level during 1933, however, the Commission required a reduction of but $1,000,000. In computing net income the Commission accepted all the company's figures for current expense, except the annual allowance for depreciation; the amount claimed on this head being $2,173,000, and the sum allowed $1,720,724. The company insisted on a 7½ per cent. return.

The controversy in the District Court revolved around three matters—value, annual depreciation expense, and rate of return. The court found the value of the property to be $39,541,921, the necessary depreciation expense $2,000,000, the probable net return under the Commission's order $1,742,005, or at the rate of 4½ per cent., as against 6 per cent., which the court held was the limit below which the return could not be reduced without confiscation.[2]

All of the figures stated embrace both intrastate and interstate business, but the parties stipulated that in respect of value, expense and income, the former repre-

[1] *Chesapeake & Potomac Telephone Co.* v. *West,* 7 F. Supp. 214.

[2] The Commission also allowed a return of 6 per cent. upon the value of the property as determined by it.

sented 85 per cent. and the latter 15 per cent. of the total. As the Commission dealt with the property as a whole, the parties, their witnesses and the District Court found it convenient to do so, having in mind the fact that in the final result only 85 per cent. of the amounts involved reflected intrastate business and the Commission's order must be limited accordingly. For similar reasons, and with a similar reservation, we shall pursue the same course. For the purposes of this proceeding the Commission's order, therefore, is to be considered as requiring a diminution of income from intrastate operations by $850,000, rather than $1,000,000.

In 1916 the Commission valued the property and prescribed rates. In 1923 the company applied for an increase; the Commission after a hearing fixed value at approximately book cost, and refused to permit the rates to be raised. The District Court, pursuant to a bill filed by the company, found the actual value exceeded book value by some $6,000,000, and enjoined the Commission from enforcing the current rates.[3] The Commission acquiesced in the decision and passed an order adopting the court's finding of value and establishing new rates. So matters stood until the initiation of the present investigation.

The company's books accurately show installations and retirements of plant and from them historical cost is ascertained to be $50,025,278 as of December 31, 1933, with a depreciation reserve of $11,483,357. The Commission made no appraisal of the physical plant and property, but attempted to determine present value by translating the dollar value of the plant as it was found by the District Court in the earlier case at December 31, 1923, plus net additions in dollar value in each subsequent year, into an equivalent of dollar value at December 31, 1932.

---

[3] *Chesapeake & Potomac Telephone Co.* v. *Whitman*, 3 F. (2d) 938, 943, 953.

Its theory was this: Value signifies in rate regulation the investment in dollars on which a utility is entitled to earn. The dollars when invested were free units of exchange value having an earning significance then and now only because they are such units of exchange. When invested they represented in the plant so many poles, miles of wires, and other items of equipment; on the other hand the same dollar units then represented certain quantities of government bonds, apartment houses, automobiles, food and services, etc. The dollars invested in the company's plant had no value unless they were exchangeable for other requirements and desires of the stockholders, and the corresponding requirements and desires of all persons who use the dollar as a measure of value. Thus a regulating body, in finding value, must find a number of universal units of earning power and purchasing power; that is, exchangeable dollars invested in place of present exchangeable dollars. How shall the relation be ascertained?

The Commission thought it found the answer in commodity indices, prepared to show price trends. It selected sixteen of these, one covering as many as 784 commodities, falling into different classes, and weighted for averaging; others much less comprehensive; and its witness calculated by the use of each index the reduction in value of the company's assets considered as a conglomerate mass of dollar value from 1923, or subsequent date of acquisition, to 1932. As might be expected the results varied widely. The lowest value found by the use of any index was $24,983,624; the highest $36,056,408—48 per cent. higher. The Commission then weighted these sixteen indices upon a principle not disclosed, giving them weights of from one to four, and thus got a divisor of thirty-one for the total obtained by adding the weighted results of all. This gave what the Commission styled its "fair value index," which it applied to the 1923 value of

668

the property then owned and to cost of all net additions in subsequent years, to obtain value as of 1932. The result, after adding some $660,000 for working capital, was a rate base of $32,621,190. The company submitted proof of estimated reproduction cost and accrued depreciation. The Commission examined and criticized this evidence, but none was offered in opposition, and the valuation was based squarely on the figures obtained by the use of its index.

In the District Court the company offered evidence of historical cost and estimates of reproduction cost less depreciation; the Commission relied solely upon the figure resulting from trending the dollar value of plant owned in 1923 and cost of net additions subsequently made. The court held the indices used inappropriate for determining present value and discarded them. It purported to consider both book cost and reproduction cost; but, in fact, as plainly appears from the opinion,[4] derived present value by the use of two figures only,—book cost as at December 31, 1933 ($50,025,278) less the entire depreciation reserve shown by the books ($11,483,357),—and thus fixed value at $38,541,921. To this is added $1,000,000, for working capital (instead of $660,000 allowed by the Commission), giving a rate base of $39,541,921. Annual depreciation expense was raised from $1,352,284 as determined by the Commission to $2,000,000. The appellants charge that in all these respects the court's action was arbitrary and cannot stand. We are not satisfied with the methods pursued either by the court or the Commission.

*First.* The Commission took the value of the physical plant in 1923 (exclusive of the then depreciation reserve), $35,147,912, and trended it to $23,689,693 as of 1932. It took annual net additions to plant (exclusive of depreciation reserves) and similarly trended them. This gave

---

[4] 7 F. Supp. 219, 222, 228.

plant value exclusive of the plant represented in the depreciation reserve. It took the depreciation reserve as at 1923 (invested in plant) and the yearly net additions to the reserve and trended each figure to 1932 value. In this way it reduced the book reserve which, at cost, stood at $10,405,147, to $7,318,086, and deducted the latter from total plant value. A table found in the Commission's report showing the operation in detail is copied in the margin.[5]

This method is inappropriate for obtaining the value of a going telephone plant. An obvious objection is that the indices which are its basis were not prepared as an aid to the appraisal of property. They were intended merely to

[5] The table is as follows:

| | | Translator | Value Dec. 31, 1932 |
|---|---|---|---|
| Value found by Court, as of Dec. 31, 1923 | $36,122,912 | | |
| Less Working Capital | 975,000 | | |
| Amount to be trended from Dec. 31, 1923 | $35,147,912 | 67.4 | $23,689,693 |
| Net Additions, 1924 | 3,199,648 | 68.2 | 2,182,160 |
| 1925 | 3,493,429 | 68.4 | 2,389,505 |
| 1926 | 4,098,230 | 70.0 | 2,868,761 |
| 1927 | 2,837,050 | 72.6 | 2,059,698 |
| 1928 | 1,854,046 | 71.8 | 1,331,205 |
| 1929 | 2,205,132 | 72.7 | 1,603,131 |
| 1930 | 2,733,968 | 77.6 | 2,121,559 |
| 1931 | 1,459,483 | 86.4 | 1,260,993 |
| 1932 | 421,708 | 100.0 | 421,708 |
| Totals | $57,450,606 | | $39,928,413 |
| *Depreciation Reserve* | | | |
| Court's Value—Dec. 31, 1923 | $6,614,963 | 67.4 | $4,458,485 |
| Net Additions, 1924 | (3,556) | 68.2 | (2,425) |
| 1925 | 200,429 | 68.4 | 137,093 |
| 1926 | 547,335 | 70.0 | 383,135 |
| 1927 | 804,711 | 72.6 | 584,220 |
| 1928 | 658,770 | 71.8 | 472,997 |
| 1929 | 823,816 | 72.7 | 598,914 |
| 1930 | 186,846 | 77.6 | 144,992 |
| 1931 | 229,100 | 86.4 | 197,942 |
| 1932 | 342,733 | 100.0 | 342,733 |
| Totals | $10,405,147 | | $7,318,086 |

indicate price trends. Indeed the record shows that one index used by the Commission and given a weight of 3,— that of the Interstate Commerce Commission,—bears a notation that it should not be used " in the determination of unit reproduction costs " upon individual properties. Doubtless the authors of the other indices would have issued a similar warning, if they had supposed anyone would attempt such a use.

Again, the wide variation of results of the employment of different indices, already mentioned, impugns their accuracy as implements of appraisal. Sensible of this discrepancy, the Commission attempted a rule of thumb corrective, by weighting the several indices upon a principle known only to itself, and thus rendered its process of valuation even more dubious and obscure. The possible factors of error are increased by the use of some indices such as that constructed by the Commission's witness upon Western Electric prices. The evidence is that these apply to about 25 per cent. of the company's purchases; that during the period of rising prices, 1924–1929, they rose more slowly than prices of other commodities and manufactured articles; that though in 1930 other prices fell, Western Electric's were raised an average of 10 per cent. In constructing an index from these prices, the

| | |
|---|---|
| Depreciated Value of Property, as of December 31, 1932 | $32, 610, 327 |
| Add Working Capital | 737, 000 |
| | $33, 347, 327 |
| Deduct Pleasant Street Property | 137, 496 |
| ( ) Indicates Subtraction. | $33, 209, 831 |
| Rate Base | $33, 210, 000 |
| Value of Property—December 31, 1932, less Working Capital | $32, 610, 327 |
| Deduct average increase in Depreciation Reserve less average increase in Fixed Capital | 650, 000 |
| | $31, 960, 327 |
| Add Allowance for Working Capital | 660, 863 |
| Average value of Rate Base for 1933 | $32, 621, 190 |

witness disregarded the increase during the period 1930–1932. The Commission gave the index a weight of 3 and applied it to all purchases of the company, although confessedly it was applicable to only one-fourth of them.

The established principle is that as the due process clauses (Amendments V and XIV) safeguard private property against a taking for public use without just compensation, neither Nation nor State may require the use of privately owned property without just compensation. When the property itself is taken by the exertion of the power of eminent domain, just compensation is its value at the time of the taking. So, where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions is a reasonable rate of return upon that value.[6] To an extent value must be a matter of sound judgment, involving fact data. To substitute for such factors as historical cost and cost of reproduction, a " translator "

[6] *Railroad Commission Cases*, 116 U. S. 307, 331; *Dow* v. *Beidelman*, 125 U. S. 680, 691; *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174, 179; *Chicago, M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S. 418, 458; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 399; *Ames* v. *Union Pac. Ry. Co.*, 64 Fed. 165, 176; *Smyth* v. *Ames*, 169 U. S. 466, 526, 541–2, 544, 546; *San Diego Land & Town Co.* v. *National City*, 174 U. S. 739, 757; *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 439, 442; *Stanislaus County* v. *San Joaquin C. & I. Co.*, 192 U. S. 201, 215; *Knoxville* v. *Knoxville, Water Co.*, 212 U. S. 1, 13, 18; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 41; *Lincoln Gas Co.* v. *Lincoln*, 223 U. S. 349, 358; *Minnesota Rate Cases*, 230 U. S. 352, 434, 454; *Denver* v. *Denver Union Water Co.*, 246 U. S. 178, 190; *Houston* v. *Southwestern Bell Telephone Co.*, 259 U. S. 318, 324, 325; *Bluefield Waterworks Co.* v. *Public Service Comm'n*, 262 U. S. 679, 690; *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, 481; *Board of Commissioners* v. *New York Telephone Co.*, 271 U. S. 23, 31; *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 408–409; *United Railways* v. *West*, 280 U. S. 234, 249; *Smith* v. *Illinois Bell Tel. Co.*, 282 U. S. 133, 149; *Los Angeles Gas Co.* v. *Railroad Commission*, 289 U. S. 287, 305.

672

of dollar value obtained by the use of price trend indices, serves only to confuse the problem and to increase its difficulty, and may well lead to results anything but accurate and fair. This is not to suggest that price trends are to be disregarded; quite the contrary is true. And evidence of such trends is to be considered with all other relevant factors. *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U. S. 461, 485; *Clark's Ferry Bridge Co.* v. *Public Service Comm'n,* 291 U. S. 227, 236.

A more fundamental defect in the Commission's method is that the result is affected by sudden shifts in price level. It is true that any just valuation must take into account changes in the level of prices.[7] We have therefore held that where the present value of property devoted to the public service is in excess of original cost, the utility company is not limited to a return on cost. Conversely, if the plant has depreciated in value, the public should not be bound to allow a return measured by investment. Of course the amount of that investment is to be considered along with appraisal of the property as presently existing, in order to arrive at a fair conclusion as to present value, for actual cost, reproduction cost and all other elements affecting value are to be given their proper weight in the final conclusion.[8]

But it is to be remembered that such a property as that here under consideration is a great integrated aggregate of many and diverse elements; is not primarily intended for sale in the market, but for devotion to the public use now and for the indefinite future; and has, so far as its market value is concerned, no real resemblance to a bushel of wheat or a ton of iron. While, therefore, the owner of such a property must assume and may not pass on to the pub-

---

[7] *Minnesota Rate Cases, supra,* 454; *McCardle* v. *Indianapolis Water Co., supra,* 410; *Los Angeles Gas Co.* v. *Railroad Commission, supra,* 311.

[8] *Los Angeles Gas Co.* v. *Railroad Commission, supra,* 306.

lic the risk involved in a general decline in values, and may have the advantage also of a general rise in such values, it would not only be unfair but impracticable to adjust the value and the consequent rate of return to sudden fluctuations in the price level. For in its essence this is the sort of aggregate whose value is not fairly or accurately reflected by such abrupt alterations in the market. A public service corporation ought not, therefore, in a rate proceeding, to be permitted to claim to the last dollar an increased value consequent upon a sudden and precipitate rise in spot prices of material or labor. No more ought the value attributable to its property to be depressed by a similar sudden decline in the price level. The present case affords an excellent example. As shown by the Commission's exhibits, the price trend was gradually ascending from 1923 to 1929. It then suffered a precipitate decline so that at December, 1932, the date of the Commission's valuation, it was at the nadir. Since then it has made a sharp recovery. The Commission recognized this. Its report and order were made November 28, 1933. At that time the price level, as shown by the all-commodities index of the United States Department of Labor, had risen 13.1 per cent. over that of December 31, 1932. For this reason the Commission, instead of cutting the net income of the company $1,396,000, allowed what has been called a " spread " or " cushion " of $396,000, by ordering a reduction of $1,000,000. The price level has since continued to rise. By the application of the same index a valuation would have been obtained at December 31, 1934, of $38,390,922, and at February, 1935 of $39,691,-038, or more than $1,000,000 greater than the amount fixed by the court as of December 31, 1933. It thus appears that the so-called spread or cushion has already been absorbed if judgment is to be based on rapid rise in spot commodity prices. What the Commission in effect did was to take the temporary low level of December, 1932,

and apply this low level for the indefinite future in ascertaining the so-called fair value of the company's plant and property. The experience of the two years which have elapsed since the Commission's order clearly indicates the impropriety of the use of its method in the appraisal of a property such as that of this company.

We agree, therefore, with the view of the District Court, that the method was inapt and improper, is not calculated to obtain a fair or accurate result, and should not be employed in the valuation of utility plants for rate making purposes. As that court observed, it is not the function of a tribunal inquiring into the question of confiscation to set aside the legislative finding for mere errors of procedure. The duty of a court is merely to ascertain whether the legislative process has resulted in confiscation. In *Los Angeles Gas & Electric Corp.* v. *Railroad Commission, supra,* this Court said:

" The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory." (p. 304.)

The language was used in respect of the claim that values of various elements had been ignored by the Commission. It was found, however, that though error might have been committed in respect of the items specified, other allowances neutralized the possible error. See, also, *Dayton, P. & L. Co.* v. *Public Utilities Comm'n,* 292 U. S.

290, 306. Nothing said in either of these cases justifies the claim that this court has departed from the principles announced in earlier cases as to the value upon which a utility is entitled to earn a reasonable return or the character of evidence relevant to that issue. It is apparent from what has been said that here the entire method of the Commission was erroneous and its use necessarily involved unjust and inaccurate results. In such a case it is not the function of a court, upon a claim of confiscation, to make a new valuation upon some different theory in an effort to sustain a procedure which is fundamentally faulty.

The principle applicable in circumstances such as this record discloses was announced in *Northern Pacific Ry. Co.* v. *Department of Public Works,* 268 U. S. 39. There a state commission set out to determine rates for intrastate transportation of logs in carloads. The carriers introduced evidence that existing rates did not yield any return on the property employed or defray the operating costs of the traffic and its proportionate taxes. The commission, without introducing evidence in contradiction of the proof submitted by the carriers as to actual operating costs, entered an order lowering the rates on the basis of a composite figure obtained largely from data in the reports submitted by the carriers and their exhibits in the proceeding, representing the weighted average operating cost per thousand gross-ton-miles of all revenue freight transported on the carriers' systems, including main line and branch line freight, interstate and intrastate, carload and less than carload. The supreme court of the State sustained the order, and this court reversed, holding that the error in the method pursued was fundamental and amounted to a denial of due process. It was said (p. 43):

"A precise issue was the cost on each railroad of transporting logs in carload lots in western Washington, the

average haul on each system being not more than 32 miles. In using the above composite figure in the determination of this issue the Department necessarily ignored, in the first place, the differences in the average unit cost on the several systems; and then the differences on each in the cost incident to the different classes of traffic and articles of merchandise, and to the widely varying conditions under which the transportation is conducted. In this unit cost figure no account is taken of the differences in unit cost dependent, among other things, upon differences in the length of haul; in the character of the commodity; in the configuration of the country; in the density of the traffic; in the daily loaded car movement; in the extent of the empty car movement; in the nature of the equipment employed; in the extent to which the equipment is used; in the expenditures required for its maintenance. Main line and branch line freight, interstate and intrastate, car load and less than car load, are counted alike. The Department's error was fundamental in its nature. The use of this factor in computing the operating costs of the log traffic vitiated the whole process of reasoning by which the Department reached its conclusion.

". . . But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may enquire into the method by which its conclusion was reached. An order based upon a finding made without evidence, *The Chicago Junction Case*, 264 U. S. 258, 263, or upon a finding made upon evidence which clearly does not support it, *Interstate Commerce Commission* v. *Union Pacific R. R.*, 222 U. S. 541, 547, is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

To the same effect see *Chicago, M. & St. P. Ry. Co.* v. *Public Utilities Comm'n*, 274 U. S. 344, 351.

There is a suggestion in the report to the effect that the Commission's method was agreed to by both parties.[9] We find, however, in the District Court's opinion, a statement that the use of index figures was the subject of contest.[10] We think the apparent contradiction is explained by reference to the record, which discloses the company used price relation to obtain the present value of certain property, but separated from other sorts each kind of property so treated. This is comparable to the practice of the Interstate Commerce Commission in translating the value of specific railroad property, e. g., steel rails, by the use of the differential between the per ton price in 1914, the date of original appraisal, and the price prevailing at a later date.[11] In this sense the company employed price indices; but it is plain that such a use of relation of values of specific articles as of two given dates is quite distinct from the application of general commodity indices to a conglomerate of assets constituting an utility plant. Much is made of the fact that in the suit brought by the company in 1923 the District Court applied a price index to cost, and thus determined the then value of the property. But this fact cannot justify the application of the same procedure here, in the face of the challenge of its propriety. In the present case the company did not put into evidence any such price indices as

---

[9] " Both the Company and the Commission realized that to attempt to find the present day fair value of the Company's property by the usual method of taking an inventory of all items of property owned by the Company and pricing out those items at present day prices would not only take at least two years of constant work but would cost the Company not less than $300,000 and cost the State a very substantial sum. It was agreed that index numbers should be used in arriving at present day costs."

[10] 7 F. Supp. 233.

[11] Compare *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U. S. 461, 486–7,

were used by the Commission but on the contrary offered evidence to show that the use of them as a sole criterion of value would be improper.

*Second.* As already stated, the District Court condemned the method pursued by the Commission, and adopted one of its own. This consisted in deducting the company's depreciation reserve from book cost and adding to the difference an allowance for working capital. It is true that the court discussed the company's evidence as to cost of reproduction new, less depreciation, but did so only to indicate its disapproval of certain large amounts embodied in the total claimed and to reconcile the figures with its own estimate. A careful reading of the opinion leaves no doubt that all other measures of value were discarded in favor of cost less depreciation reserve.

It is clear that in a period of low prices costs incurred when the price level was much higher are not a safe guide in appraising present value. The court so conceded. The depreciation reserve was built up on the straight line theory.[12] The company asserted that the amount of the reserve did not represent observed and accrued depreciation at the date of valuation,[13] as much of the total consisted of funds provided in anticipation of future depreciation and obsolescence. The court agreed and further found that on account of decreased demand for service, with consequent diminishment of obsolescence, the percentage of reserve had in recent years sharply increased. The question of going value was the subject of controversy. The court recognized that this element must be considered, but refused to make any separate allowance for it.

---

[12] See *Lindheimer* v. *Illinois Bell Telephone Co.*, 292 U. S. 151, 167–8.

[13] Compare *Clark's Ferry Bridge Co.* v. *Public Service Comm'n, supra*, 239.

What the court did in fact was this: It found that book cost less actual accrued depreciation would probably give too high a figure. It sought to correct the probable error by deducting from cost the entire depreciation reserve, though conceding this exceeded actual depreciation. It felt that this large deduction would also redress any excess of cost over present value; and finally it said the result of its method would be appropriate to allow for going value.

Two quotations from the opinion will illustrate the basis of the court's action.

"We are not unmindful that at the present time the depreciation reserve is slightly higher than normal and to the extent that it is, it is unfavorable to the company in the final result . . . But this disadvantage to the company is, we think, off-set by allowing it the full of its actual costs despite the generally lower trend of prices.[14]

"All relevant facts considered, we are of the opinion that a fair allowance for going value is made when we value the telephone property as a whole and as a going concern at its actual book costs less full depreciation." [15]

The opinion in essence consists of the conclusion, that, all the circumstances considered, it will be fair to appraise the property at cost less depreciation reserve. This rough and ready approximation of value is as arbitrary as that of the Commission, for it is unsupported by findings based upon evidence.

*Third.* For the reasons stated we cannot sustain the District Court's valuation. We have shown that the Commission's order violates the principle of due process, as the measure of value adopted is inadmissible. It is not our function, and was not the function of the court below, to do the work of the Commission by determining a rate

[14] 7 F. Supp. 228.
[15] 7 F. Supp. 226.

base upon correct principles. The District Court, upon finding that the Commission reached its conclusions as to fair value from data which furnished no legal support, should have enjoined enforcement of the rate order. The court's action was therefore right, regardless of the method it pursued in reaching the decision that the order was confiscatory.

The grounds upon which we decide the case render it unnecessary for us to consider the appellants' challenge of rulings of the District Court respecting working capital and annual depreciation allowance, or to discuss the rate of return to which the company is entitled in view of the agreement of the court and the Commission upon this point.

The decree is

*Affirmed.*

MR. JUSTICE STONE, dissenting.

I think the decree should be reversed.

The suit is in equity, brought in a federal district court to set aside the legislative action of the State in prescribing telephone rates through the agency of its public service commission. The sole issue raised by the pleadings, and the only one presented to us and to the court below, is whether there is confiscation of appellee's property by reduction of its rates. It is not within the province of the federal courts to prescribe rates or to revise rates fixed by state authority, unless property is taken without due process in violation of the Fourteenth Amendment. *Central Kentucky Natural Gas Co.* v. *Railroad Commission,* 290 U. S. 264, 271, 272. This Court, in setting aside the order of the Commission and leaving the old rates in force, does not pass upon that issue. It does not hold that the rate fixed by the Commission will confiscate appellee's property, nor does it agree with the determination of the district court below that it will.

For it is declared that the district court has not followed the rules sanctioned by this Court for determining the fair value of the property of a public service company and, in consequence, its conclusion that there has been confiscation must be rejected. But, notwithstanding the errors of the district court, this Court upholds its decree. The order of the Commission is thus set aside, upon a ground not raised upon the record or considered by the court below. This is done not because the rate is confiscatory, but because the method by which the Commission arrived at its conclusion, which is now pronounced " inapt " and " erroneous," is declared to be unconstitutional.

The Fourteenth Amendment is thus said to be infringed, not because the appellee has been deprived of any substantive right, but because the Commission's action is deemed a denial of due process in the procedural sense. But not even the procedure is condemned because. it lacks those essential qualities of fairness and justice which are all the Fourteenth Amendment has hitherto been supposed to exact of bodies exercising judicial or *quasi*-judicial functions. The Commission has punctiliously adhered to a procedure which acts only after notice and hears before it condemns. *Hurtado* v. *California,* 110 U. S. 516, 535, 536; *Holden* v. *Hardy,* 169 U. S. 366, 389–391; cf. *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, 457; *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.,* 227 U. S. 88, 91. The sole transgression, for which its painstaking work is set at naught, is that, in the exercise of the administrative judgment of this body " informed by experience " and " appointed by law " to deal with the very problem now presented, see *Illinois Central R. Co.* v. *Interstate Commerce Comm'n,* 206 U. S. 441, 454, it has relied upon a study of the historical cost and ascertained value of appellee's plant in the light of price indices, showing declines in prices, in arriving at the present fair value of the property, a procedure on which this

Court has hitherto set the seal of its approval. *Clark's Ferry Bridge Co.* v. *Public Service Comm'n,* 291 U. S. 227, 236; see also *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U. S. 461.

In this state of the record it is unnecessary to consider whether the appellee has sustained the burden placed upon it of establishing confiscation, or to demonstrate, as I think may be done, that the facts found by the court below, and on which it acted, fall far short of showing that appellee's property is in any danger of confiscation. It is enough to point out that this Court has rejected the conclusions of the district court because it used book value as a measure of present fair value in times of falling prices, and that even with its findings of fair value, probable earnings and rate of depreciation, the district court found that the rate of return would be approximately 4½% on the property of one of the most stable of public utilities. If adjustment be made for a plainly excessive depreciation allowance, the rate of return on the court's figures would be raised to 5.10%.[1] The company supported its claim of confiscation by no evidence of the cur-

---

[1] The depreciation rate of 4% adopted by the Court in the place of the 3.45% allowed by the Commission is so plainly erroneous as to require its rejection. The Commission's conclusion was reached upon the ground that the abrupt cessation of expansion of the telephone business had greatly reduced the need for retiring property because inadequate to care for increased business. The district court conceded that the 1933 allowance at the 4.38% charged by the company was at least $1,250,000 higher than was necessary to maintain the customary 20% depreciation reserve against plant in service. The court nevertheless rejected the estimate of the Commission on the ground that " too much reliance must not be placed upon the experience of a single year." It thus concluded that a federal court may declare a rate order confiscatory because it differs with the Commission's predictions of future trends in the telephone business. It would seem hardly within the range of judicial omniscience to establish confiscation by overriding the Commission's determination that the telephone business is not likely markedly to expand in the near future.

rent yields of comparable investments and by no evidence of the rate of return generally obtaining in the money market.[2] The general conditions of the money market and the rate of return on invested capital may have a controlling influence in determining the issue of confiscation. *Bluefield Water Works Co.* v. *Public Service Comm'n,* 262 U. S. 679, 693; *United Railways* v. *West,* 280 U. S. 234, 249. There is at least grave doubt whether a return of 4½% is so out of line with the current yield on invested capital as to be deemed confiscatory. This doubt, if accepted principles be applied, must be resolved against the company, which has offered no evidence by which the doubt could be removed. Twenty-five years ago, in times far more prosperous than these, this Court unanimously declined to take judicial notice that an estimated net return of 4% would be confiscatory. *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 17.

In determining whether the procedure of the Commission involves any denial of federal right, open to review by collateral attack in the federal courts, it is important to consider a little more closely the nature of its "error." In 1925 the fair value of respondent's property as of 1923 was judicially determined by a federal district court of three judges, in a suit brought to set aside the Commission's determination. *Chesapeake & Potomac Telephone Co.* v. *Whitman,* 3 F. (2d) 938. The Commission had found the fair value of the property to be $24,350,000, about $1,500,000 more than net historical cost. The court

[2] The Commission introduced evidence that in 1932, 53.0% of 296 corporations, listed on the New York Stock Exchange and chosen at random, suffered a net loss, and that 65.9% earned less than 4% on their invested capital; 22.9% of the railroads listed on the Exchange suffered a net loss, and 89.6% earned less than 4% on their invested capital. Baltimore savings banks paid 3% in 1933; in December, 1933, prime commercial paper brought 1½%; call loans averaged 0.94%; United States Treasury Notes averaged 0.29% and Treasury Bonds 3.62%.

found the fair value to be $29,500,000, an increase of 21%
over the Commission's valuation and of 29% over cost.
The court arrived at the increase by precisely the same
basic method which the Commission employed in the
present case,[3] except that the Commission has applied it
here with far greater care and thoroughness.

With this history before it the Commission, in its re-
port in the present case states:

" Both the Company and the Commission realized that
to attempt to find the present day fair value of the Com-
pany's property by the usual method of taking an inven-
tory of all items of property owned by the Company and
pricing out those items at present day prices would not
only take at least two years of constant work but would
cost the Company not less than $300,000 and cost the
State a very substantial sum. It was agreed that index
numbers should be used in arriving at present day costs."
It is of no importance that the " agreement " to which the
Commission refers was not formally spread upon the rec-
ord, for the record itself shows that no objection was made
to the introduction in evidence of the price indices offered
both by the Commission and by appellee, and that no ef-
fort was made by either party to prove the value of ap-
pellee's property by engineers' appraisals of the whole
property, or by estimates of present value based on expert
observation or knowledge of the entire property. By com-
mon consent the case was tried before the Commission
on the theory that present fair value for rate making pur-
poses could be arrived at with substantial accuracy by the
application of price indices to the 1923 value as it had been
judicially ascertained, and to the cost of subsequent an-

---

[3] While not undertaking to declare the method universally appli-
cable, it increased historical cost by an amount corresponding to the
changes in the index of wholesale prices prepared by the Bureau of
Labor Statistics.

nual additions to the property after deducting accrued depreciation.

The Commission did not adopt any single index. It prepared its own index for translating book value into present fair value, on the basis of an elaborate study of price indices of recognized merit.[4] The result of this study it adopted and applied as more trustworthy than the index prepared by appellee, the salient features of which will presently be considered.

---

[4] Sixteen price indices were used by the Commission. Five of them related to commodity prices, and included the comprehensive and reliable index of wholesale prices prepared by the United States Bureau of Labor Statistics. Five indices of construction costs were included, prepared by trade journals and concerns allied with the construction industry. Two indices of the price of building materials were used. An index of general consumers' purchasing power, issued by the Federal Reserve Bank of New York, was added. A painstakingly prepared index of Baltimore wages was included in order to insure adequate representation of labor costs. To guard against any peculiarity in the price trends of telephone property, two specialized indices were also taken into consideration. One was the Interstate Commerce Commission index of telephone and telegraph property owned by railroads. That the Interstate Commerce Commission stated that "the indices represent territorial index factors and are not applicable for use in the determination of unit reproduction costs upon individual roads" does not lessen the value of the index as one element of the valuation or as a check on the results reached by other indices. Finally, an index based upon Western Electric prices for telephone equipment and apparatus was used (after elimination of a price rise in 1930, found by the Commission to be artificial). This index is incontrovertibly applicable to 25% of the company property. It is not to be wholly rejected because it is not a perfect and a certain measure of the whole property.

These results were averaged. Since some of the indices were more accurate than others, and since some were more directly applicable to telephone property, they were assigned greater weights. It is clear that these were the considerations which influenced the Commission's judgment as to the appropriate weighting. For example, the Bureau of Labor Statistics wholesale price index received a weight of four;

The Commission did not refuse to receive or to consider any of the evidence presented. Its decision and order were based upon an examination, commendable for thoroughness and skill, of all the evidence. Its error, if error there was, did not consist in receiving and considering the evidence submitted of indices showing changes in commodity and other prices. It would have been error for the Commission not to have considered it. In *St. Louis & O'Fallon Ry. Co.* v. *United States, supra,* this Court set aside a recapture order of the Interstate Commerce Commission on the sole ground that the Commission had failed to consider evidence before it tending to show that the reproduction cost of the structural property of the railroad was greater than original cost. The only evidence of this character disclosed by the record consisted of index figures showing the comparative price levels of labor and materials for 1914 and each of the subsequent recapture years.[5] The valuation of the property by the Commission was set aside by this Court on the ground that the Commission

the Interstate Commerce Commission index of telephone and telegraph property and the index based on Western Electric prices each received a weight of three; all the other indices were given a weight of one to two. The results of the highest and lowest of the indices differed from the Commission average only by 10.6% and 23.4% respectively. Eleven of the sixteen indices separately considered gave results ranging between $30,000,000 and $34,600,000. There is plainly a rather close clustering about the average of $32,610,327 found by the Commission.

[5] Of the twenty-four structural property accounts of the O'Fallon Railroad, seventeen were trended from 1914 prices by the use of the wholesale price index of the Bureau of Labor Statistics, one by the National Industrial Conference Board's index of average hourly earnings on railways, and four by the use of an index of railway equipment prepared by the " President's Conference Committee of Federal Valuation," and two were continued at cost. None of the accounts was adjusted to current price levels by direct estimates or by direct pricing of the equipment, much of which was equipment purchased second-hand and long in service.

had failed to consider the evidence of increased value over cost. In *Clark's Ferry Bridge Co.* v. *Public Service Comm'n, supra,* 236, this Court held that the Supreme Court of Pennsylvania, in sustaining the action of a state commission, rightly rejected engineers' appraisals and estimates of value, in favor of a lower valuation by the Commission based on cost and a study of charts showing the price trends of labor and materials from 1924 to 1930 inclusive. In affirming the judgment of the state court, this Court expressly approved this method of arriving at fair value, although it was less meticulously and carefully applied than by the Commission in this case, and held that the evidence of cost and of price trends, of the same character as those on which the Commission acted here, outweighed engineering appraisals of the whole property, which the appellee here did not choose to offer.

The extent of the Commission's error thus appears to be that in considering all the evidence before it, in the manner approved by the *Clark's Ferry Bridge Co.* case, *supra,* it thought that the 1923 value of the appellee's plant and equipment, and actual cost of subsequent additions, reasonably adjusted so as to conform to generally recognized changes in the prices of labor and materials, as shown by reliable price indices, would afford a better guide to present fair value than the evidence offered by the company. The results thus obtained were checked against current wage scales in construction industries in Baltimore and vicinity, and against the prices of specific commodities entering into the construction of telephone equipment. The company's evidence consisted of its own price index, derived by appraising samples of its property, ranging from 1% to 20% of the total property of each type, and assuming similar appraisals for each intervening year since 1923. Its index was based in substantial part on monopoly prices charged appellee for equipment purchased from its affiliate, the Western Elec-

tric Company, which is subject to the same corporate control as appellee, and on its own labor costs for construction work as shown by its books at a time when it was engaged in no important construction. The Western Electric Company is shown to have increased its prices of equipment 10.2% in November, 1930, at the very time when prices of commodities and similar manufactures were declining. This increase is reflected in the index used by the company. Upon all the evidence, the Commission concluded that appellee did not sustain the burden resting on it, see *Western Distributing Co.* v. *Public Service Comm'n*, 285 U. S. 119, 124; *Smith* v. *Illinois Bell Telephone Co.*, 282 U. S. 133, 153; *Dayton Power & Light Co.* v. *Public Utilities Comm'n*, 292 U. S. 290, 308, of showing the reasonableness of the prices paid by it to its affiliate. The labor costs of the small amount of construction work carried on by the company were shown to be materially higher than those prevailing in the construction trades in Baltimore and vicinity. In 1930 (the date chosen by the company) they were about 147% of their 1923 level, while in December, 1932, (the valuation date) Baltimore wages generally were about 87% of that level. It is unnecessary to discuss other defects of appellee's proof so extreme as to discredit it.[6] Its reliance here upon its own proof is at most perfunctory. It seeks only to sustain the conclusions of the court below, which this Court rejects.

Public utility commissions, like other *quasi*-judicial and judicial bodies, must try cases on the evidence before them.

---

[6] In appellee's proof overhead during construction cost was estimated at 19% of the " directly distributed cost." Accrued depreciation was based on physical impairment rather than reduction in value and the element of obsolescence was ignored. " Going value " amounting to 10.7% of the swollen valuation thus obtained was added, with no showing of necessity of any additional or independent allowance for going value.

No basis has been suggested for declaring that the work of the Commission must be rejected because of its reliance upon evidence which it was bound to consider, unless we are also prepared to say that its result was wrong. If we are unable on any ground to find that confiscation will occur, I cannot say that actual cost or ascertained value of the structural equipment of the telephone company, trended in accordance with reliable price indices, is any less trustworthy evidence of present fair value than the more customary engineers' appraisals and estimates, which appellee did not think it worth while to offer, or that, in any case, such a determination infringes any constitutional immunity.

In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence. Precluded from consideration of the unregulated earning capacity of the utility, they must find the present theoretical value of a complex property, built up by gradual accretions through long periods of years. Such a property has no market value, because there is no market in which it is bought and sold. Market value would not be acceptable, in any event, because it would plainly be determined by estimates of future regulated earnings. Estimates of its value, including the items of " overheads " and " going concern value," cannot be tested by any actual sale or by the actual present cost of constructing and assembling the property under competitive conditions. Public utility properties are not thus created full fledged at a single stroke. If it were to be presently rebuilt in its entirety, in all probability it would not be constructed in its present form. When we arrive at a theoretical value based upon such uncertain and fugitive data we gain at best only an illusory certainty. No court can evolve from its inner consciousness

the answer to the question whether the illusion of certainty will invariably be better supported by a study of the actual cost of the property adjusted to price trends, or by a study of the estimates of engineers based upon data which never have existed and never will. The value of such a study is a question of fact in each case, to be ascertained like any other in the light of the record, and with some regard to the expert knowledge and experience of the Commission which, in the present case, are obviously great.

It is said that the price indices " were not prepared as an aid to the appraisal of property," that " they were intended merely to indicate price trends," a suggestion that seems to assume that known price trends are irrelevant to the determination of the present fair value of property whose cost is known. It is also said that the " wide variation of results of the employment of different indices . . . impugns their accuracy as implements of appraisal." The use of a single price index to the exclusion of all others, it is true, might well produce as inaccurate a result as if a single engineer's estimate were used to the exclusion of all others, and without test of its verity. But the record affords striking evidence of the accuracy of the composite index translators prepared and used by the Commission, quite apart from the relatively close agreement in the results obtained by the individual indices. From 1923 until 1930, when the Western Electric Company raised its prices, the Commission's index translator accurately reflected the changes in price actually paid by appellee for its purchased equipment, and the Commission and company indices were in close conformity. Eliminating these price changes and the excessive labor costs appearing in the company's own index, the resulting present fair value of appellee's equipment did not differ substantially from the Commission's valuation of it. So far as the results of the use of standard price indices are impugned by their variation, an examination of the present record will dis-

close that the results obtained by the application of price indices to the historical cost of plant are far less variable than engineers' valuations and in general are probably more trustworthy.[7] To speak of either class of evidence as so accurate as to require a commission as a matter of law to accept it, or so inaccurate as to require the rejection of a valuation based upon it, is to attribute to the valua-

---

[7] The lowest result obtained by the Commission in the use of the sixteen classes of price indices was 76.6% of the Commission's valuation. The highest was 110.6%. Against these differences of only 23.4% and 10.6%, the record shows that in rate cases before the Maryland Public Service Commission, the Company valuations based on engineering appraisals had exceeded the Commission's similar valuations by amounts ranging from 25.0% to 59.4%. The average was 41.3%. Most of the rate cases reported in the 1931 and 1932 Public Utility Reports were examined. In the 1931 reports the company valuations similarly exceeded commission valuations by amounts ranging from 2.1% to 71.2%. The average was 28.9%. In the 1932 reports the company valuations exceeded commission valuations by amounts ranging from 7.7% to 135.4%. The average was 57.4%.

An example of the variation in results obtained by an engineering appraisal of telephone property is found in the record in *New York Telephone Co.* v. *Prendergast*, 36 F. (2d) 54. The minority report of the Commission on Revision of the New York State Public Service Commission Law (1930) at page 266, summarizes the different estimates of fair value as of July 1, 1926, as follows:

|  | *Valuation* | *Increase over the Commission Valuation.* |
|---|---|---|
| Majority of Commission | $366, 915, 493 | |
| Statutory Court | 397, 207, 925 | 8. 2% |
| Minority of Commission | 405, 502, 993 | 10. 5% |
| Master's report | 518, 109, 584 | 41. 2% |
| Company claim based on Whittemore appraisal | 528, 753, 738 | 44. 1% |
| Company claim based on Stone & Webster appraisal | 615, 000, 000 | 67. 1% |

The comment of the report, page 265, is that " the variety of conclusions reached in the course of this case is dramatic evidence that the concept of ' fair value,' as an objective, provable fact is a judicial myth."

tion process a possibility of accuracy and certainty wholly fictitious. Present fair value at best is but an estimate. Historical cost appropriately adjusted by reasonable recognition of price trends appears to be quite as common sense a method of arrival at a present theoretical value as any other. For a period of twenty years or more of rising prices, commissions and courts, including this one, have regarded price variations as persuasive evidence that present fair value was more than cost. I see no reason for concluding that they are of less weight in times of declining prices.

If I am mistaken in this view, it does not follow that a like error of judgment by a state commission is a violation of the Constitution, and that a federal court can rightly set aside its order, even though there is no confiscation. It is true that in *Northern Pacific Ry. Co.* v. *Department of Public Works*, 268 U. S. 39, this Court, in holding invalid an order arbitrarily lowering rates which the only evidence of probative value showed were already confiscatory, criticized the method adopted by the Commission and characterized its action as a denial of due process. But the Court was careful to point out (p. 44) that:

" The mere admission by an administrative tribunal of matter which under the rules of evidence applicable to judicial proceedings would be deemed incompetent, *United States* v. *Abilene & Southern Ry.*, 265 U. S. 274, 288, or mere error in reasoning upon evidence introduced, does not invalidate an order."

And in *Chicago, M. & St. P. Ry. Co. v. Public Utilities Comm'n*, 274 U. S. 344, 351, where this Court set aside the rate fixed by a state commission as confiscatory, the method of valuation pursued by the commission was characterized as erroneous and open to review by this Court, as of course it is when the validity of the result is the subject of inquiry. But in no case hitherto has this

Court assumed to set aside a rate fixed by a state commission, not found to be confiscatory, merely for what it conceived to be an erroneous method of valuation. If such an error in the deliberations of a state tribunal is a violation of the Constitution, I should think that every error of a state court would present a federal question reviewable here. It would seem that doubts, if any, as to the scope of our review of the action of a state commission in a case like the present, had been put at rest by our decision, two terms ago, in *Los Angeles Gas. Co.* v. *Railroad Commission,* 289 U. S. 287. There the Commission made its valuation on the basis of prudent investment, a method repeatedly repudiated by this Court. It was argued that the erroneous method pursued by the Commission vitiated its order, whether confiscatory or not. The Court emphatically repudiated that argument, saying (pp. 304, 305):

" We do not sit as a board of revision, but to enforce constitutional rights. *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 446. The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached. but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the State's authority unless confiscation is clearly established."

Such should be our decision now.

Mr. Justice Brandeis and Mr. Justice Cardozo join in this opinion.