## PACIFIC GAS & ELECTRIC CO. v. RAILROAD COMMISSION OF CALIFORNIA et al. (CITY AND COUNTY OF SAN FRANCISCO et al., Interveners).

### No. 3660–S.

District Court, N. D. California, S. D.

March 9, 1936.

Chaffee E. Hall, Charles P. Cutten, Warren Olney, Jr., Allan P. Matthew, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for plaintiff.

Ira II. Rowell, Roderick B. Cassidy, and Frank B. Austin, all of San Francisco, Cal., for defendants.

John J. O'Toole, City Atty., and Dion R. Holm, Asst. City Atty., both of San Francisco, Cal., for intervener City and County of San Francisco.

C. Stanley Wood, City Atty., and John W. Collier, Deputy City Atty., both of Oakland, Cal., for intervener City of Oakland.

J. Leroy Johnson, City Atty., of Stockton, Cal., for intervener City of Stockton.

Before WILBUR, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

### PER CURIAM.

Under proceedings instituted upon its own motion, the Railroad Commission of California issued an order November 13, 1933, fixing the rates to be charged by the Pacific Gas & Electric Company in its gas service. The order considerably reduced the company's net annual revenue, the Commission putting the reduction at $1,-744,881. The company brought suit in this court to restrain enforcement of the order upon the usual constitutional grounds. An interlocutory injunction was granted by a statutory three-judge court. As there was grave doubt in the mind of the court as to whether the evidence supported the Commission's order (5 F.Supp. 878, 881), the cause was referred to a special master to take testimony and evidence upon the issues and to report to the court his findings of fact and conclusions of law. The reference was later modified by stipulation of counsel providing for the submission of the cause upon the record already made before the Commission, together with certain supplementary evidence to be introduced. Three municipalities and one individual taxpayer, claiming to be interested in the cause, filed petitions in intervention which were granted, and interveners were allowed to participate in the hearings. Such contentions as were made by interveners are disposed of by the decision herein on the issues presented. Following a hearing, the master filed his report, together with his findings of fact and conclusions of law.

The company is engaged in serving natural and artificial gas in the more densely populated areas of central and northern California. Its electric service is even more extensive. Minor utility service includes water, steam, and street railways. The investment in its business and properties exceeds $661,000,000, of which roughly one-sixth is in the gas business. Prior to 1929, the gas supplied was manufactured gas, having a heating value of about 550 British Thermal Units per cubic foot. In 1929, following the discovery of the Kettlemen Hills oil and gas field, situated about 180 miles southeast of San Francisco, and indications that it would furnish, for a considerable future period, a supply of natural gas adequate for the company's needs, the company commenced the construction of pipe lines and other facilities necessary to bring gas from that field, and also from a field of less importance further south, known as Buttonwillow field. The work was completed in 1930 at a cost estimated by the company in excess of $23,000,000, but which defendants say cost $17,277,000. The gas is purchased from the Standard Oil Company of California and other owners of oil lands under long-term contracts. There are two transmission lines, one wholly owned by the plaintiff, the other by a corporation whose stock is owned equally by plaintiff and the Standard Oil Company of California.

Seven towns and their outlying territory north of Sacramento are still supplied with

manufactured gas. This area provides only about 3 per cent. of the company's revenue from gas sales. There has been no reduction in rates in this area in the Commission's order here under attack.

The natural gas area has a population of about 1,700,000, and the number of consumers' services exceeds 457,000. Of the generators in the natural gas territory, some have been retired, but the majority have been converted to make a diesel-oil gas of about 950 BTUs, and afford essential stand-by service.

The natural gas being supplied by the company has a heating value of from 1150 to 1200 BTUs, more than twice the heating value of the artificial gas formerly supplied. As the works necessary to bring the natural gas to the various territorial areas or divisions of the company were completed, formal rate hearings on the company's applications were held, and interim rates were established. The effect of the introduction of the new gas and the application of these rates was to reduce consumers' bills for gas between 40 per cent. and 50 per cent. A typical list of consumers, using nothing but gas, paid 41 per cent. less for service, but consumed 33.5 per cent. more gas during the period August 1, 1931, to July 31, 1932, as compared with a similar period 1928–29. Plaintiff claims that a gross savings to all consumers amounted to $8,172,825 a year, figured on an amount of natural gas containing the same amount of heat as was contained in the manufactured gas in the prior period, and the savings would be greater if the increased amount of natural gas used were considered. Plaintiff says in its opening brief that the effect on the company "was for the time being to reduce substantially its revenue. This reduction was not in proportion to the saving to the consumers, because of the increase in the use of gas due to its cheapness and the company's active sales campaign;" that the new rates ·fell far short of yielding the return which they should yield in order that the company might receive a fair return.

The company attacked the order of the Commission upon the grounds: (1) That the Commission did not regularly pursue its authority and its action was arbitrary and a denial of due process of law; and (2) that the rates prescribed were confiscatory.

While the master expressed the opinion that it appeared plain to him that the Commission used cost as the only measure of the rate base, itself offering no evidence on reproduction cost and rejecting that offered upon the subject by the company, he preferred not to pass upon the question of law thus presented, but to examine the whole matter on the merits.

The master found that the fair present value of the plaintiff's property, used and useful in the service of gas during the year ending July 15, 1934, was $112,305,196, as against the rate base found by the Commission based upon historic cost in the sum of $105,000,000. The master further found that under the rates prescribed by the order, if said rates had been in effect, the gross revenues of plaintiff for the service of gas for the year ending July 15, 1934, would have been $20,198,318.29; that the fair and reasonable operating expenses of plaintiff during said period would have been the sum of $15,821,511.90; that the net revenues of plaintiff during said year ending July 15, 1934, would have been the sum of $4,376,806, which return is at the rate of 3.89 per cent. per annum on the fair present value of plaintiff's property as found by the master during the operative period of said rates, and that neither said return nor said rate is fair. The master concluded that the order and the rates prescribed thereby are confiscatory and are void as in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States.

At the hearing before the Commission, its staff presented evidence as to historic cost of the company's properties, but none whatever of their reproduction cost. The company presented evidence not only as to historic cost, but also as to reproduction cost and accrued depreciation. Upon such a record, the Commission took historic cost as constituting the rate base upon which it based its finding that the company's existing rates are unreasonable and fixed the new and reduced rates. In its opinion under the subheading "Value, Rate Base, and Return," the Commission says:

"During its entire history in establishing reasonable rates for utilities similar to this company, to determine a proper rate base this Commission has used the actual or estimated historical costs of the properties undepreciated, with land at the present market value. Consistent with this, it has used the sinking fund method to determine the allowance for depreciation to be included in operating expenses.

"This historical method has dominated the Commission's findings for several principal reasons. It is well grounded upon established facts, is not subject to the vagaries of pet theories, unlimited imagination and abrupt fluctuation of current prices and passing conditions, and therefore indicates a truer measure of value upon which, through the application of rates, a return may be allowed to reimburse the owner for his enterprise and insure the integrity of his capital honestly and prudently invested. At the same time it prevents unwarranted demands upon the consumer through the projections of future rates on ephemeral values and stabilizes rates so that economic shocks from such changes are reduced to a minimum.

"It is an economical procedure, where the books of the companies are reasonably well kept, as obtains in practically all of the major utilities of this state, full compliance with which will prevent unwarranted expenditures of money by the Commission, the public and the company, which inures to the benefit of both the consumers and the utility. It is a more rapid procedure insuring quicker compliance with necessities as they arise.

"Since regulation was undertaken through the medium of the Commission, this Company has acquiesced in the methods above described but at the same time qualifying its acceptance by a reservation intended to preserve what it contended was its legal rights. During this period of twenty years this Company was developed and prospered as have other major California utilities. Just what legal rights this Company possesses that the Commission has not preserved for it during this period in a meticulous care for the public interest does not appear in any of our records. In fact, counsel for the Company in argument admit that the Commission has carefully supervised and safeguarded the accounting, the financing and the property of the Company so that it could adequately supply to its consumers a service which is one of the dominant public necessities. But, as is the habit of counsellors for utilities, they fear greatly that the Commission will depart from its policies. It is not, however, the policy of prudent investment from which they fear we will depart. Indeed, as will be seen in an examination of the testimony, the Company was careful not to put in the record anything substantial upon which this Commission could depart from this policy. In fact, the Company does not want the Commission to depart from its well established policy, except as to the rate of return allowed. The Commission proceeds in this matter with the objective of regulating return in a way that will amply guard against unreasonable rates and protect future financing and the investment; also, at the same time, that there will be conformity within reason to the general economic conditions and a production of results which will compare in some degree to the return enjoyed by comparable business. This latter measure, if there is such a thing as business comparable to that of the utilities, of course, even though enunciated by the Supreme Court of the United States, cannot be taken too literally, otherwise confiscation and bankruptcy would follow at a time like the present. This and other findings of the courts must be considered and applied from a practical and sympathetic standpoint and in consideration of all of the facts of record."

Under the caption "The Evidence, Reproduction Cost Estimate," the opinion continues:

"Testimony regarding the cost to reproduce the properties here under consideration was presented by the Company's valuation engineer on several price bases, all being developed through the application of price translation factors, and not through the application of appropriate prices to an inventory of the property. In each pricing period offered the estimate to reproduce was higher than the historical cost. For the first six months' period of 1933 the reproduction cost was shown as 8 per cent higher than historical. A perusal of price trend charts introduced by the Company elsewhere in the proceedings indicate that the estimate must be in error. It is not conceivable that a property, 80 per cent of which has been constructed in the high price period following 1919, could not be reproduced for a lesser cost under prices prevailing in the first 6 months of 1933. Witness for the City of San Francisco clearly indicated why the estimate was erroneous when he showed that the method used ignored certain factors tending in later years to decrease cost, such as improvement in construction materials and methods, increased use of mechanical equipment and a lessening in the width of the excavations and pavement cut. The

estimates of cost to reproduce are not at all convincing and cannot be of positive value in this proceeding."

The attorney for the Commission makes the following statement in his brief:

"It may be conceded at once that the rate base of $105,000,000 taken by the Commission closely approximated the valuation estimates made by both Commission and Company witnesses intending to reflect as near as possible, with the exception of lands, the actual cost of the property. We shall presently show just how that valuation was derived. But for the moment it may be conceded to be a valuation obtained by the historical method. The Commission made itself entirely clear in this regard. * * *

"The Commission need offer no apology for preferring actual cost of a utility's property to mere appraised value as a basis of estimating just and reasonable rates. The Commission knows that utilities of this state, including the plaintiff here, have prospered under that method of rate fixing. It followed that method during the years of rising construction costs and has adhered to it during the recent years of declining prices. One of the counsel for this Company when appearing in a rate proceeding involving its subsidiary the San Joaquin Light and Power Company in 1932, urged the Commission in the following words not to depart from that policy:

"* * * 'I shall ask that the Commission adopt a rate base made up as follows: (a) Historical cost of structures, rights of way, water rights, and intangibles, less certain amounts paid out of earnings; (b) Market value of fee lands; (c) Actual investment in materials and supplies. * * the Commission has a faith to keep, not only with the public, but with the Company that for twenty years has been under its jurisdiction and control, not alone with respect to the fixing of rates but also with respect to the issuance of securities. * * * The Commission may not, consistent with the keeping of the faith, when for twenty years it has taken historical cost as the measure of value and thereby has kept rates down, switch now to reproduction cost if the result would be a further depression of rates.' Calif. Farm Bureau Fed. v. San Joaquin L. & P. Corp., 37 C.R.C. 530, 540.

"Of course the relationship between the cost to reproduce and the actual cost of the property of one utility may not be taken as measuring such a relationship in the property of another. Nor may a utility, or the Commission, be bound by its action in some other proceeding. But, nevertheless, the past regulatory policy of the Commission, and the acceptance of that policy by the utility, is of first importance in determining the issue of confiscation in a given case. * * *

"No argument is made that the rate base of $105,000,000 taken by the Commission does not represent the historical cost of the Company's gas property. In the affidavit of the Company's president filed with the complaint the historical rate base set up, exclusive of going concern value, is $105,309,028. It is necessary, then, only to briefly describe the method by which that figure was obtained.

"The Commission's valuation engineer, Mr. John E. Cooper, in testifying in respect to the cost of the property, explained in some detail the method employed in estimating the historical cost. Since 1919 the Company's books show major capital additions and retirements as made. Records are not available from which the actual cost of all property constructed prior to that date may be ascertained. Therefore for capital prior to 1919 he accepted a valuation made in that year by the Company itself.

"The records show the actual cost of the greater part of the property subsequently constructed but during the period subsequent to the 1919 valuation there were acquired by the Company various other utility properties which were added to capital at their then appraised values. On property included in the 1919 valuation, retirements have since largely been made upon the values then accorded. Thus, in accepting the Company's records as representative of the historical cost of the property, the Commission's witness relied not solely upon records of actual cost, but accepted appraisals made by the Company itself upon a considerable part of the property. The Company's witness pursued the same method. * * *

"The Commission in its opinion stated that the estimate of reproduction cost submitted by the Company was not at all convincing and that it was of no positive value in the proceeding. It was expressly considered, but was rejected. It will not re-

quire an extensive discussion to show the reasons for its rejection."

An examination of the opinion and order of the Railroad Commission shows that they did not undertake to ascertain the fair value of the property nor a fair return upon that value. They did fix the rate base at approximately the historic cost and estimated the fair return on that base as $7,000,000. We quote that portion of the findings of the Railroad Commission as follows:

"Adjusted Results:

"The adjustments having been made in accordance with the preceding recommendations, the following results are accepted as reasonable:

| | | |
|---|---|---|
| "Revenue | | $22,500,000 |
| Deduct: | | |
| Operating expenses and taxes | $11,836,000 | |
| Depreciation expense | 1,769,119 | |
| Amortization of non-useful capital | 150,000 | |
| Total Deductions | | 13,755,119 |
| Available for Return | | $ 8,744,881 |
| Rate Base | $105,000,000 | |
| Fair Return | | 7,000,000 |
| Return earned in excess of fair return | | $ 1,744,881* |
| Reduction in revenue effected by rates ordered herein | | 2,100,000 |

"*This sum represents the reduction which should be made in the net earnings of the Company. Rates of course may be reduced a greater amount as the reduction in the state gross revenue tax and in Federal income tax. Thus the gross reduction possible in order to still preserve a $7,000,000 return to the Company is approximately $2,225,000."

In view of the rejection by the Commission of all evidence concerning the cost to reproduce the property, and in the absence of a specific finding as to the fair value of the property, the question is whether the decision of the Commission can stand as against a charge that the plaintiff had been denied due process of law. This question has been considered in a very recent case by the Supreme Court. West v. C. & P. Tel. Co., 295 U.S. 662, 55 S.Ct. 894, 79 L.Ed. 1640. In that case the Commission fixed the value of the property of the public utility. In doing so it purported to consider evidence of the historical cost of the property and also the reasonable cost of reproduction of the system. This cost of reproduction was estimated by reference to certain indices involving price trends. The Supreme Court held that the attempt to ascertain reproduction cost by the use of these price indices was "inappro-

priate for obtaining the value of a going telephone plant" (Id., 295 U.S. 662, at page 669, 55 S.Ct. 894, 896, 79 L.Ed. 1640). It was held by the court that in view of this erroneous method of determining reproduction cost, the public utility was denied due process of law. We quote from that decision as follows: "It is apparent from what has been said that here the entire method of the commission was erroneous and its use necessarily involved unjust and inaccurate results. In such a case it is not the function of a court, upon a claim of confiscation, to make a new valuation upon some different theory in an effort to sustain a procedure which is fundamentally faulty." (Id., 295 U.S. 662, at page 675, 55 S.Ct. 894, 899, 79 L.Ed. 1640).

Referring to its previous decision in Northern Pacific Ry. Co. v. Department of Public Works, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836, the court quoted with approval the following statement contained in the last-mentioned case: "But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may inquire into the method by which its conclusion was reached. An order based upon a finding made without evidence (The Chicago Junction Case, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667), or upon a finding made upon evidence which clearly does not support it (Interstate Commerce Commission v. Union Pacific R. R., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308), is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

Referring to the action of the District Court, the Supreme Court, in West v. C. & P. Tel. Co., supra, said: "The opinion in essence consists of the conclusion that, all the circumstances considered, it will be fair to appraise the property at cost less depreciation reserve. This rough and ready approximation of value is as arbitrary as that of the commission, for it is unsupported by findings based upon evidence.

"Third. For the reasons stated we cannot sustain the District Court's valuation. We have shown that the commission's order violates the principle of due process, as the measure of value adopted is inadmissible. It is not our function, and was not the function of the court below, to do the work of the commission by determining a rate base upon correct principles. The District

Court, upon finding that the commission reached its conclusions as to fair value from data which furnished no legal support, should have enjoined enforcement of the rate order."

It is clear from the decision of the Supreme Court in West v. C. & P. Tel. Co., supra, that it is a denial of due process for the state regulatory body to refuse to consider proper evidence of the cost of reproduction and that rates fixed in that manner are illegal and void. A fortiori, it is a denial of due process to refuse to consider any evidence of the cost of reproduction. It follows that the order of the Commission fixing gas rates is void as violative of Amendments 5 and 14 of the Constitution of the United States, and that the execution of the order must be enjoined. We do not pass upon the factual exceptions to the master's report, and do not approve or reject his findings as to the fair value of the plaintiff's property, or determine the net income which would result from the rates fixed by the Commission, or determine what would be a fair rate of return, but rest our decision solely upon the denial of due process of law by the Commission in fixing the rates in question.

Accordingly, the temporary injunction heretofore decreed and issued will be made permanent, and plaintiff will have judgment for its costs. Plaintiff may submit decree and special findings of fact and conclusions of law as provided by Equity Rule 70½, 28 U.S.C.A. following section 723.