A. J. FOBLE ET AL. *v.* MILDRED KNEFELY
[No. 17, April Term, 1939.]

*Decided April 28th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*V. Calvin Trice,* for the appellants.

*Henry Lloyd, Jr.,* and *Le Roy L. Wallace,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This case has been in intermittent litigation since November, 1933. It involves a claim of Mildred Knefely against A. J. Foble, trading as Foble Shirt Company, employer, and the Phoenix Indemnity Company, insurer, for compensation for disability resulting from an injury said to have been caused by an accident which the claimant said arose out of and occurred in the course of her employment. The record omits matters which for clarity should have been included, and includes others which

might well have been omitted, and leaves in obscurity the earlier steps in the proceeding. It may be inferred, however, that the claim was filed in November, 1933, that the supposed accident occurred on September 20th, 1933, that at a hearing in March, 1934, the Commission decided that the disability resulted from an accident which arose out of and in the course of her employment, and awarded the claimant compensation aggregating $298 for temporary total disability, reserving the question of any permanent disability for future consideration. Over four years later, after hearings extending over a period of more than two years, the Commission rescinded its order of March 21st, 1934, and disallowed the claim. From that order the claimant appealed to the Circuit Court for Dorchester County, where a judgment was entered reversing the order of the Commission, and remanding the case that the Commission might determine the extent of the disability. This appeal is from that order.

The appeal presents a single question, which is whether the evidence in the case was legally sufficient to support a reasonable inference that the disability suffered by the claimant resulted from an accidental injury arising out of and in the course of her employment by Foble. That question was raised by the refusal of the appellants' three demurrer prayers. All other objections to the rulings of the trial court were expressly abandoned, and need not therefore be considered.

The claimant, at the time she was injured, was employed by Foble to operate a machine for sewing cuffs on shirts. The machine is mounted on a table and in appearance is not unlike the ordinary domestic sewing machine. The fabric to be sewed is held in place by the pressure of a flat thin plate called a foot, projected at a right angle from a small iron or steel rod against a flat base. To operate the machine the foot is lifted, either by a small hand lever, or by a knee press, and the fabric inserted between the foot and the base. Ordinarily the foot is lifted by the knee press rather than by

the hand lever. The knee press is a thin rod extending vertically through the table, to which is attached by a sleeve and a set screw a vertical flat elliptical plate which slides up and down on the rod, so that it may be adjusted to the height of the operative's knee, and is fastened in place by the set screw. It is operated by a lateral pressure to the right of the operative's knee against the flat side of the plate, which lifts the foot and permits the insertion of the fabric. When the pressure against the knee press is released, the foot descends and clamps the material against the base, and the knee press springs back to a vertical position.

On May 21st, 1935, the employer and insurer filed with the Commission a request for a hearing on these issues: "(1) Has the claimant sustained a permanent partial disability from the accident in this case? (2) If she sustained a permanent partial disability, to what extent is it?", to which these issues were later added: "(4) By Claimant: Attorney's fee. (5) By Atty.—Employer: Has the claimant refused to accept medical attention offered her by the employer and failed to·secure proper medical attention elsewhere. (6) Whether her disability was aggravated or prolonged and was such conduct on her part arbitrary or unreasonable." Following that request there were at least three hearings before the Commission, one on April 24th, 1936, one on November 19th, 1937, and one on June 3rd, 1938, and on July 28th, 1938, the Commission "rescinded" its order. of March 21st, 1934, and disallowed the claim. On August 22nd, 1938, the appeal from that order was filed, and on October 7th, 1938, what purported to be a transcript of the record from the Commission was filed in the Circuit Court for Dorchester County, which was supplemented by an additional transcript filed on October 18th,. 1938. In neither transcript was there any statement of the contents of the order of March 21st, 1934, nor indeed any reference to it at all except the bare statement in the final order of the Commission that it was rescinded, and, so far as the record shows, there was no request

on the part of the employer and insurer for a rehearing on the question of the compensability of the temporary disability, nor any request on the part of the claimant for compensation for permanent disability, nor was the question of whether the claimant's disability resulted from an accidental injury arising out of and in the course of her employment in issue before the Commission until June 3rd, 1938, when it was said to have been "raised" by the attorney for the employer and insurer. June 3rd, 1938, was the day on which the taking of testimony before the Commission was concluded, and from that evidence it appeared without dispute that the claimant had suffered a permanent partial disability. It was at that stage in the case that the insurer, the employer having died, "raised" the issue which the Commission had decided in March, 1934, of whether claimant's disability was caused by an accidental injury arising out of and in the course of her employment.

At the time of the accident Mrs. Knefely had been operating the machine described above for about two weeks. Her work, sewing cuffs on shirts, required her to operate the knee press about two hundred and eighty eight times an hour.

In addition to these facts, which are not in dispute, there was evidence tending to prove other facts which may be thus stated: The knee press "should work very easy. It is just a light touch," but the knee press on the particular machine operated by the claimant was "right stiff," and its operation required more force than was needed for other machines used for the same work. One operative, who worked on the same machine after the accident, said: "It was in such condition that I would not want to operate it." Another operative, who worked on the same machine before Mrs. Knefely operated it, said: "Well, I had to make a lot of complaints about that foot press being stiff. It injured my leg—bruised it. I had green marks on it. * * * I noticed the pedal or foot press, whatever you might call it, was stiff—hard to press. I had to hit it harder than I did on the other machine."

Mrs. Knefely complained of the condition of the machine to a Miss Fannie Fatzer, a forewoman, and also to one Merrick, a foreman. She requested Merrick to have it adjusted, but he said, "there wasn't anything wrong with it" and did nothing. As stated above, the plate was attached to the knee press by a sleeve which was made to slide along the vertical rod, and was held in place by a set screw. At times that screw would become loose, and the plate would slide around the rod so that its edge, or the set screw itself, would be pressed by the operative's knee as she operated the machine, instead of the flat surface of the plate.

There appear to have been four hearings before the Commission in connection with the claim, one in March, 1934, one in April, 1936, one in November, 1937, and one on June 3rd, 1938. At the trial in the Circuit Court the claimant was asked this question: "Now on the 16th day of March 1934, before the State Industrial Accident Commission in a hearing at the court house in Cambridge, Maryland, did you or not testify in reference to this accident and as to the way it happened, as follows: 'When the knee first began to hurt you was it all at once or gradual?' Answer: All at once." She was then asked "Do you recall that?" and she answered: "Well, I meant it came all at once." She was then asked "Did you so testify as I have read?" and she answered: "Yes, sir, I did. It did come all at once, and it gradually got worse all the time. That is what I meant."

The transcript of claimant's testimony given before the Commission on June 3rd, 1938, over four years later, indicates that she made these statements at that hearing: "Q. Did your knee get sore all at once or over a period of time? A. Gradually. "Q. Over what period of time was it getting sore—when had you noticed it, before you quit work—how long before you quit work? A. Just a day or so it started to get sore and I was taken to the doctor right away. "Q. It started to get sore just a day or two before you quit? A. No, sir. "Q. Was there any particular shove or push that caused it to be sore? A. No,

it was the constant pushing of it that caused it to get sore."

At the trial in the Circuit Court she described her injury in the following testimony: "Well, this knee press was right stiff. In order for me to operate it I put the material in the machine and just as I was ready to turn the knee press over it slipped and turned around and gave me such a jar. I knowed my knee was hurting me. I looked down and there was a bruise there. It happened all at once.  *  *  *  When this machine, the trouble occurred, you mentioned it to Miss Fatzer? A. Yes, sir. "And what did you tell her?  *  *  * A. I told her my knee was hurting very badly—that I had hurt it on the machine. She said, 'Yes, and you better go home right away.' And I did.  *  *  * "Tell the jury just how the injury to your knee occurred in the operation of this machine?  *  *  *  Well, in order to operate this machine, the knee press was very stiff and hard to operate, so I had to lift the material up, and just as I was lifting the material up to put in the machine, the knee presser turned around and the screw part hit my knee. And right then and there my knee hurt me so bad I looked down and it was bruised. It hurt all at once, and gradually kept getting worse all the time."

At the conclusion of her testimony she was asked whether at the hearing before the Commission on June 3rd, 1938, she had not testified that her knee got sore gradually, and she replied: "Well, it did get sore all at once and gradually got worse." Then she was asked: "At the same time and same place to which I have just referred, were you not asked the following questions and your answers to them as follows, with reference to how this occurred? Question: Over what period of time was it getting sore—when had you noticed it, before you quit work—how long before you quit work? Answer: Just a day or so it started to get sore and I was taken to the doctor right away. Question: It started to get sore just a day or two before you quit? Answer: No, sir.

Question: Was there any particular shove or push that caused it to get sore? Answer: No, it was the constant pushing of it that caused it to get sore. Did you testify as I have just read to you?" And she answered: I don't think I did."

Mrs. Fatzer, the forewoman, said that the claimant had reported to her on September 20th, 1933, that the knee press was "working hard and hurt her knee," and said that "it hurt her knee as she raised it," that late in the afternoon she examined the knee and it "looked a little red," and that the next morning the knee was "greenish, like a bruise just commencing to bruise," and the witness told Mrs. Knefely that she could not go to work. Claimant also directed the attention of others to her injury, and on the night of September 20th she complained that her knee hurt her very badly.

On the morning of the twenty-first, after she had been told by Mrs. Fatzer that she could not work, she was taken to the office of Dr. Wolf by Mr. Foble. After that she was treated by Dr. Wolf, Dr. Faw and Dr. Riley, she was taken to a hospital "for X-ray," the leg from the thigh to the ankle was placed in a cast, and later she was directed by the "Insurance Company" to go to a hospital in Philadelphia, where she was "operated on." She was discharged before her wound healed, and on her way to the train she fainted. There was also medical testimony that her injury is serious, permanent and disabling.

The appellants' contention, submitted by their three demurrer prayers, is that these facts are not legally sufficient (a) to show that the injury which resulted in claimant's disability was accidental in its orign, or (b) to overcome the statutory presumption in favor of the finding of the Commission. That contention rests upon two theories, one, that the injury which caused the disability was occupational and not accidental, and, two, that claimant's own testimony at the several hearings before the Commission and at the trial in the Circuit Court, was so conflicting and contradictory that it is incredible and without any probative force.

The appellants however in their brief make this concession: "Had the claimant relied upon the testimony she had given before the Commission at the hearing in March, 1934, on which she was allowed compensation, it is conceded that she would then have had a case to be submitted to the jury and it, with reason, found that her injury was compensable." The significance of that concession is found by comparing it with the statement made by the claimant at the hearing before the Commission on March 16th, 1934, "When the knee first began to hurt you, was it all at once or gradual?" "All at once," and her comment that "It did come all at once, and it gradually got worse all the time." That statement is entirely consistent with the statement made by the claimant at the trial in the Circuit Court that, as she was lifting the material up to put in the machine, "the knee presser turned around and the screw part hit my knee. And right then and there my knee hurt me so bad I looked down and it was bruised. It hurt all at once, and gradually kept getting worse all the time." Nor was it so inconsistent with her statement to the Commission on June 3rd, 1938, quoted above, as to justify the gratuitous and improper charge in appellants' brief that it was "invented" for the "sole purpose" of making the injury "appear to have been sudden." In it she said that the knee became so sore "just a day or so," which was consistent with her entire testimony that it became sore on the 20th of September and that she reported for work on the following day, but that because of her condition she was not allowed to go to work, and was taken to a "doctor right away." And then, when counsel for the appellants asked her, "It started to get sore just a day or so before you quit?" she answered: "No, sir."

Even if it be assumed that the claimant made the statement, attributed to her in the transcript from the Commission, that the injury was caused by the "constant pushing" of the knee press and not by any "particular shove," there is no such inconsistency inhering in it as to destroy the credibility of her statement in court that

the severe pain came all at once and gradually grew worse. When she is said to have made the statement, on June 3rd, 1938, more than four years had passed since she first testified before the Commission. In that time she had been required to tell her story over and over again and it would be strange if all of her statements, made in the course of that protracted litigation which has been dragged out for nearly six years, were in all respects identical. It is undoubtedly consistent with her testimony that the tissues about her knee had become inflamed by constant pressure against her knee, and that the inflammation became acute when "the knee presser" turned and the "screw part" hit her knee. That statement is consistent too with her statement in March, 1934, that the "hurt" came on all at once, and with her statement in June, 1938, that it was sore "just a day or so it started to get sore and I was taken to the doctor right away."

When a witness gives testimony which as to material facts is in such obvious and irreconcilable conflict that, if part of it be true, the rest must be false, it cannot be accepted as the basis of a judicial conclusion. *Slacum v. Jolley,* 153 Md. 343, 351, 138 A. 244; *U. S. Fid. & Guar. Co. v. Baking Co.,* 172 Md. 24, 33, 190 A. 768; *Lusk v. Lambert,* 163 Md. 335, 338, 163 A. 188. But that rule has generally been applied to the testimony of a witness given at the trial in which the objection is made, and is not ordinarily extended to the testimony of a witness who is impeached by proof of conflicting statements made at some other time, or in some other trial, for in such cases the solution of the conflict and the weight of the evidence are questions for the jury and not for the court, (*Miles v. Webb,* 162 Md. 269, 273, 159 A. 782; *Merchant's Delivery Co. v. Knoche,* 162 Md. 683, 686, 161 A. 275; *Porter v. Greenbrier Quarry Co.,* 161 Md. 34, 38, 155 A. 428; *Lusk v. Lambert,* 163 Md. 335, 338, 163 A. 188), for it is the "peculiar and exclusive province of the jury" to decide upon the credibility of the witnesses. *Jones on Evidence,* sec. 901; *Hempel v. Hall,* 136 Md.

174, 110 A. 210. That the question is primarily one of the credibility of the witness seems manifest. *Travelers' Insurance Co. v. Melman,* 147 Md. 459, 472, 128 A. 125; 70 *C.J.* 1152; *Jones on Evidence,* sec. 901. Statements made at a trial are admissible at a subsequent trial only for the purpose of impeaching the witness who made them, not as substantive evidence. 70 *C.J.* 1153; *State v. C. J. Benson & Co.,* 129 Md. 693, 698, 100 A. 505. The comment of the court in the case last cited, that the jury were empaneled "to determine the facts, not to pass upon the credibility of any particular witness," was obviously an inadvertence, since, while the competence of a witness is for the court, his credibility is for the jury or other triers. *Ibid.*

So that the doctrine of *Slacum v. Jolley, supra,* is not applicable to this case since, in dealing with the legal sufficiency of the evidence, the court was limited to a consideration of the effect of the evidence given in the trial court in this case, and could not consider the evidence before the Commission, which was only admissible for the purpose of impeachment, or in lieu of oral testimony. *Baltimore v. Perticone,* 171 Md. 268, 272, 188 A. 797; *Spence v. Bethlehem Steel Co.,* 173 Md. 539, 542, 197 A. 302; *Harvey v. George J. Roche & Son,* 148 Md. 363, 366, 129 A. 359. Since therefore it was the office of the jury and not the function of the court to pass upon the credibility of claimant's testimony, the trial court could not properly have excluded her testimony from consideration in passing upon appellants' demurrer prayers.

The second contention of the appellants is that the claimant's disability resulted from an occupational disease rather than from an accidental injury. That contention loses much of its force, however, if the claimant's own testimony may be considered, for it is consistent with her testimony, taken in connection with the testimony of the other witnesses, that while the tissue on the right side of her leg at the knee was inflamed and

bruised by the steadily recurrent pressure of the knee press, the onset of the acute inflammation which prevented her from continuing to operate the machine, and resulted in the disability asserted in her claim, was sudden. It is also consistent with the evidence that her injury was caused by faulty adjustment of the knee press of the machine which she was operating when she was injured, and that the probable effect of operating the improperly adjusted knee press was not known to her until her operation of it culminated in the injury which disabled her.

That she was not suffering from an occupational disease is demonstrable. The nature of the injury does not satisfy the literary definition of a disease, which ordinarily implies some morbid derangement of the bodily functions. (*Dorland's Med. Dict., Oxford Dict., Winston's Dict.*), but is more consistent with the injury and destruction of tissue by the application of external force, such as a blow. It cerainly has none of the characteristics of an occupational disease, which may be defined as some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach. *Words and Phrases* 3rd and 4th series; *Lovell v. Williams Bros.*, (Mo.App.), 50 S.W.2nd 710, 713; *Gunter v. Sharp & Dohme*, 159 Md. 438, 443, 151 A. 134; *Victory Sparkler Co. v. Francks*, 147 Md. 368, 379, 128 A. 635. It is the antithesis of an accidental injury, which in Workmen's Compensation law is generally accepted as meaning physical injury to the bodily tissues caused by some unusual condition or occurrence in the employment, and is associated in varying degrees with the elements of force, violence, and surprise, (*Schemmel v. T. B. Gatch*, 164 Md. 671, 680, 166 A. 39; *State Roads Commission v. Reynolds*, 164 Md. 539, 546, 165 A. 475), and the distinction between the two classes of injuries is illustrated by comparing the cases of *Victory Sparkler Co. v. Francks, supra*, with *Sinsko v. Weiskettel & Sons Co.*, 163 Md. 614, 163 A. 851.

While the word accident connotes suddenness, it does not necessarily imply that the occurrence is instantaneous for, as stated in *Lovell v. Williams Bros., supra:* "It is obvious that happening suddenly does not mean happening instantaneously. The lexical meaning of the word 'sudden' is this: Happening without previous notice, or with very brief notice; coming unexpectedly; rapid and unforeseen; hastily prepared, employed, made or done, as, a sudden cure, or a sudden departure; hasty by nature; violent; rash, precipitate; come upon, or met with, unexpectedly; unexpected; unusual; abrupt; unlooked for." And that interpretation is consistent with the conclusion stated in *Victory Sparkler Co. v. Francks, supra,* that an an injury may be accidental even though the conditions which caused it extended over a considerable period of time. In *Lovell v. Williams Bros.,* emphasis was placed on the meaning of "sudden," because under the Missouri statute an "accident" was defined as an unexpected event "happening suddenly," while in *Victory Sparkler Co. v. Francks, supra,* emphasis was placed on the meaning of "accidental injury," because the Maryland statute does not define accidental, but does allow compensation for an "accidental personal injury," (Code, art. 101, sec. 14), but notwithstanding that difference both cases reach the conclusion that an accidental injury may be one caused by conditions extending over a substantial period of time. In *Lovell v. Williams Bros., supra,* the claimant was employed in digging a ditch with a dull spade. There was "lots of roots" in the ditch. He asked for an axe but was told to use the spade. In gouging out the roots his hand began to get sore and swollen and he complained to the "boss," who told him "to quit hitting so hard." Three days later he went back to work, but his hand was so badly swollen that he was sent to a physician. It was held that his injury was accidental and not occupational.

In this case there is evidence legally sufficient to support the conclusion that claimant's knee was bruised and injured by the operation of the knee press which,

because of faulty adjustment, was stiff and hard to move, that while she of course knew that the machine was badly adjusted, stiff, and hard to operate, she did not know, and she did not expect, that operating it would injure her knee, that finally the injury, which caused the acute inflammation which prevented her from continuing to operate the knee press, was caused by the press plate slipping around the rod to which it was fastened, so that when she pressed her knee against it she struck the set screw instead of the flat smooth surface of the plate.

Without further laboring the point, it is sufficient to say that those facts were sufficient to overcome the statutory presumption in favor of the appellants (*Moore v. Clarke,* 171 Md. 39, 45, 187 A. 887), and to require the submission of the issue of whether her disability resulted from an accidental injury arising out of and in the course of her employment, to a jury, and that appellants' demurrer prayers were properly refused. *Geipe Inc. v. Collett,* 172 Md. 165, 168, 190 A. 836, 109 A.L.R. 887. The judgment from which this appeal was taken will therefore be affirmed.

*Judgment affirmed, with costs.*