# ELISHA LOVELLETTE, JR. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE AND SUBSEQUENT INJURY FUND

[No. 128, September Term, 1982.]

*Decided September 28, 1983.*

272

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*William H. Engelman,* with whom were *Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A.* on the brief, for appellant.

*L. William Gawlik, Assistant City Solicitor,* with whom were *Benjamin L. Brown, City Solicitor,* and *Sheldon H. Press, Chief Solicitor,* on the brief, for appellee Mayor and City Council of Baltimore. *John J. Szymanski, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee Subsequent Injury Fund.

MURPHY, C. J., delivered the opinion of the Court.

This case involves a workmen's compensation claim filed by a municipal fire fighter pursuant to Maryland Code (1957, 1979 Repl. Vol.) Article 101, § 64A, which provides in pertinent part:

"(a) Any condition or impairment of health of any paid municipal . . . fire fighter . . . caused by lung diseases, heart diseases, or hypertension . . . resulting in total or partial disability or death shall be presumed to be compensable under this article and to have been suffered in the line of duty and as a result of his employment.

"(b) Any paid fire fighter . . . whose compensable claim results from a condition or impairment of health caused by lung diseases, heart diseases or hypertension . . . and has been suffered in the line of duty shall receive such benefits as are provided for in this article in addition to such benefits as he may be entitled to under the retirement system in

> which said fire fighter ... was a participant at the time of his claim. The benefits received under this article however, shall be adjusted so that the total of all weekly benefits shall not exceed one hundred percent of the weekly salary which was paid to said fire fighter ...."

The relevant facts are these: Elisha Lovellette, Jr., at age fifty-four, was a twenty-six year veteran of the Baltimore City Fire Department when, on May 16, 1977, his truck company responded to a fire alarm. During the course of his duties on the fire scene, Lovellette tried to lift an extremely heavy overhead door when he experienced sharp chest pains and tightness across his chest. He was taken by ambulance to Mercy Hospital. He was released the same day when his distress abated, but a few hours later, upon reporting to the fire department infirmary, he again experienced "vice-like" chest discomfort, and was admitted to Mercy Hospital. Lovellette was treated in the hospital's coronary care unit where he remained for twenty-four days. He never returned to work. On February 9, 1978, he was retired from the Fire Department after qualifying for a special disability pension. Shortly thereafter, Lovellette filed his claim for benefits under § 64A.

At a hearing before the Commission's Medical Board for Occupational Diseases, Lovellette testified that he had been in excellent health when he joined the Fire Department in 1951 and, until the events of May 16, 1977, had never suffered from high blood pressure or heart disease. Medical reports were submitted which attributed Lovellette's distress on the fire scene and his ensuing medical condition to an acute myocardial infarction [1] initiated by the sudden stress and strain incident to his efforts to open the overhead door. The reports also noted the likely existence of some

---

1. Commonly called a "heart attack," a myocardial infarction results from the sudden blockage of one or more of the arteries which nourish the heart muscle. The affected area of heart muscle dies from lack of oxygen, and the consequence, at minimum, is a weakened heart or, if severe enough, the victim may die from the resulting cardiac insufficiency. *See* 1 C. Dufner, *Attorney's Textbook of Medicine,* "Heart Disease," ¶ 30.80 (1968).

preexisting arteriosclerotic cardiovascular disease.[2] The reports further indicated the absence of any family history of hypertension or heart disease.

The Medical Board concluded from the testimony and the medical reports "that the claimant's acute coronary disease was directly the result of immediate sudden strenuous activity and considers it to be accidental in nature." The Board further concluded that Lovellette did not sustain an occupational disease within the contemplation and coverage of § 64A, although it acknowledged that "the alleged disease, condition or impairment" was caused by Lovellette's employment.

Lovellette petitioned the Commission for a review of the Medical Board's findings and decision. After conducting a hearing, the Commission said:

"After review of all the evidence this Commission finds that the claimant sustained an accidental injury arising out of and in the course of his employment and reaffirms the decision of the Medical Board as to occupational disease."

The Commission noted that its determination that Lovellette's condition resulted from an accidental injury precluded him from recovering workmen's compensation benefits under the financially more beneficial occupational disease provisions of § 64A.[3] In so holding, the Commission relied upon *Colgan v. Board of Co. Comm'rs,* 21 Md. App. 331, 320 A.2d 82 (1974), *aff'd, Bd. of Co. Comm'rs v. Colgan,* 274 Md. 193, 334 A.2d 89 (1975).

---

**2.** Commonly known as "hardening of the arteries," arteriosclerotic cardiovascular disease occurs when fatty deposits build up on the inner wall of the body's blood vessels. This reduces the vessels' flexibility and ability to pass blood (consequently increasing blood pressure and the heart's workload) and, if the deposits flake off and block an artery, the condition can lead to a myocardial infarction, a stroke or other forms of localized tissue death. *See generally* 1 Schmidt, *Attorney's Dictionary of Medicine* (1980).

**3.** Under § 33 (c) of Art. 101, Lovellette's compensation benefits for an accidental injury would be fully offset by the receipt of his special disability

Lovellette appealed to the Superior Court of Baltimore City (now the Circuit Court for Baltimore City). He contended that the Commission erred as a matter of law in its interpretation of § 64A and of the decision in the *Colgan* case.

*Colgan* involved a county fire fighter who suffered two heart attacks while at work; the first occurred when he was filling out papers in the fire station and the second, six months later, while he was supervising the remodeling of a new Fire Department office.[4] Colgan claimed workmen's compensation benefits under § 64A, not for an accidental injury, but for an occupational disease. The Commission nevertheless considered the claim as one for accidental injury and rejected it. Colgan's appeal eventually reached the Court of Special Appeals where he claimed that he was entitled to benefits under § 64A because his disability was caused by occupational heart disease which, under the statute, was presumed to be work-related and compensable in the absence of a showing that his medical condition was not causally related to his employment as a fire fighter. The Court of Special Appeals, in an opinion by Judge W. Albert Menchine, considered the legislative history underlying enactment of § 64A:

"Section 64A came into being as Chapter 695 of the Acts of 1971. In the course of its passage through the legislature, both the title and the body of the Bill (H.B. 433) were amended. As introduced, the title of the bill had provided, *inter alia,* that its purpose was to 'establish certain medical conditions where the death or disability of a fire fighter is *presumed to be accidental* and as a result of his employment.' (Emphasis added in *Colgan.*) An amendment to the title of the bill struck out the

pension. If his claim under § 64A was sustained, Lovellette would receive workmen's compensation benefits in addition to his pension, provided that the total amount received not exceed 100% of his former weekly salary.

4. See stipulation of facts in the briefs of the parties in No. 604, September Term, 1973, Court of Special Appeals.

above quoted language and declared that its purpose was to 'provide that there is *a presumption of compensable occupational disease* in cases of certain fire fighters sustaining temporary or total disability or death under certain conditions.' (Emphasis added in *Colgan.*)

"The body of the bill at introduction had contained the words: '*presumed to have been accidental* and to have been suffered in the course of his employment.' (Emphasis added in *Colgan.*) By amendment in the course of passage the above quoted language was stricken and the following words substituted: '*presumed to be compensable under this Article* and to have been suffered in the line of duty and as a result of his employment.' (Emphasis added in *Colgan.*)"

*Colgan, supra,* 21 Md. App. at 335.

The intermediate appellate court found no repugnancy between the title and the body of the act; it said that § 64A "should be interpreted as granting such benefits in accordance with the provisions of [the workmen's compensation] article as they relate to occupational diseases." *Id.* at 336. Also noted by the court in *Colgan, id.* at 339, was that fourteen states have enacted legislation by which the disability of a fire fighter caused by lung or heart disease is presumed to be employment connected. The court, in rejecting several constitutional attacks on the special treatment afforded fire fighters under § 64A, noted that "There is general public knowledge that fire fighters, in the course of their daily activities, are exposed to inhalation of smoke or noxious fumes and are subjected to unusual stresses and strains." *Id.* at 343. Finding the statute constitutional, the court remanded the case "for consideration as for an occupational disease" and determination whether Colgan's heart disease was compensable under § 64A.

We affirmed the judgment of the Court of Special Appeals in *Colgan,* adopting that court's conclusions and much of the language of its opinion. Additionally, we noted that § 64A "does not deal with accidental injury," 274 Md. at 200; that "the Act addressed itself to compensable disease," *id.* at 209; and that § 64A should be regarded "as an extension of the benefits provided by statute for occupational disease," *id.* at 210. We also concluded that the presumption under § 64A is a rebuttable one of fact, and not of law. *Id.*

In interpreting *Colgan,* the Superior Court (Karwacki, J.) held that for Lovellette to recover under § 64A, it was an essential prerequisite that the Medical Board find that he suffered from an occupational disease; that the Board found that Lovellette's condition "was the result of an accidental injury of traumatic origin"; and that since Lovellette's medical condition was not considered to be an occupational disease under § 64A, that section had no application.

Lovellette appealed to the Court of Special Appeals. In affirming the trial court's order in an unreported opinion, that court said:

"Appellant contends that § 64A's presumption automatically takes effect whenever a fire fighter *claims* to have suffered any disability impairment of health as a result of heart or lung diseases or hypertension. Our reading of the statute does not support this construction. According to § 64A there must be an initial determination of the existence of '[a]ny condition or impairment of health . . . caused by lung diseases, heart diseases, or hypertension. . . .' . . . After the Commission has established the existence of such a condition, caused by one of the enumerated occupational diseases, the presumption that the resulting disability is compensable, as a result of employment, takes effect. *Id.* Any other construction would render meaningless the unambiguous causation requirement imposed by § 64A. (Emphasis in original.)

\* \* \*

"In support of his argument that the Commission improperly refused to apply § 64A, appellant places considerable emphasis on the fact that the provision makes no specific reference to 'accidental injury' or 'occupational disease.' This Court, nevertheless, acknowledged that § 64A was 'intended to amend workmen's compensation law in the field of occupational diseases.' *Colgan v. Board of County Commissioners,* 21 Md. App. 331, 337 (1974), *aff'd* 274 Md. 193 (1975). The opinion of the Court of Appeals observed that the title of the act made it clear that § 64A did not deal with 'accidental injury.' *Id.* 274 Md. at 200. Furthermore, workmen's compensation law in this State has long recognized that accidental injuries and occupational diseases are antithetical in nature. *Foble v. Knefely,* 176 Md. 474, 486 (1939). The use of those terms in the order adopted by the Commission does not indicate a misapplication of § 64A.

"Finally, there was legally sufficient evidence before the Commission's Medical Board to find that appellant's impairment was not caused by heart disease or hypertension. The medical reports strongly implied that the myocardial infarction was caused by appellant's attempt to lift the heavy door rather than any coronary schlerotic disease."

We granted certiorari to consider the important issue of statutory interpretation involved in the case.

(1)

The Workmen's Compensation Act encompasses two categories of compensable events. Section 15 covers an accidental personal injury sustained by an employee arising out of and in the course of his employment. Section 22 covers an employee who suffers from a disabling occupational disease which is "due to the nature of the occupation."

*Colgan* decided that Section 64A constituted an amendment to the law relating to occupational diseases. As earlier indicated, in *Colgan* we viewed § 64A "as an extension of the benefits provided by statute for occupational disease"; we said that the provisions of § 64A must be harmonized with other provisions of the Act pertaining to occupational diseases. 274 Md. at 210. Accordingly, Lovellette's claim for benefits under § 64A was referred to the medical board of the Commission, as required by §§ 28 — 29 of the Act to determine whether, within the contemplation of § 64A, Lovellette suffered from a disabling occupational disease. In so proceeding, the medical board was governed by all applicable provisions of the Act relating to occupational diseases, including § 67 (13) which defines an "occupational disease" to mean "the event of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as the result of and in the the course of employment . . . ." Also involved in the medical board's determination of whether Lovellette suffered from a disabling occupational disease was the case law definition of an occupational disease as "some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and [which] is ordinarily slow and insidious in its approach . . . the antithesis of an accidental injury . . . ." *Foble v. Knefely,* 176 Md. 474, 486, 6 A.2d 48 (1939). Additionally, in making its determination, the medical board was required to consider the provisions of § 23 (c) of the Act which, at the time of Lovellette's claim, specified that an employer would not be liable to pay compensation for a disabling occupational disease unless it was "due to the nature of an employment in which the hazards of such disease actually exist, and to a reasonable degree of medical certainty is attributable to his type of employment, and is actually incurred in his employment . . . ."[5] The medical board was required to apply these general precepts in light

5. Section 23 (c) has since been amended by ch. 706 of the Acts of 1980. *See* Code (1982 Cum. Supp.), Art. 101, § 23 (c).

of the provisions and purpose of § 64A which, as to fire fighters, makes any disabling condition or impairment of health caused by lung disease, heart disease or hypertension presumptively compensable as an occupational disease contracted in the line of duty and as a result of employment.

The City maintains that § 64A has no application in this case because the medical reports before the medical board indicated that the specific signs and symptoms of Lovellette's heart disease developed concurrent with his physical stress on the fire ground when he attempted to lift the overhead door. This indicates, according to the City, "a direct relationship" between Lovellette's then-current activities as a fire fighter and the episode of heart muscle damage which occurred on the same date. The City argues that while Lovellette may have had some degree of coronary schlerotic involvement prior to the incident of May 16, 1977, the medical reports, as well as Lovellette's own testimony, showed that it did not result in functional limitation of any nature. From this the City reasons that Lovellette's myocardial infarction was not the result of a slow and insidious occupational disease but rather resulted from an accidental injury — the very antithesis of an occupational disease.

The City maintains that once an impairment of a fire fighter's health caused by heart disease is found to exist, § 64A (a) does no more than remove the fire fighter's burden of showing that he comes within the occupational disease provisions of § 23 (c) of the Act. Thus, the City urges that if the medical board concludes that the fire fighter's disability was caused by a personal accidental injury, and not by an occupational disease, the presumption created by § 64A (a) is inapplicable. Expanding on its argument, the City says that one of the elements of proof that must be shown to support an award for an occupational disease is that some functional limitation must thereby result which disables the claimant from performing his work; that Lovellette's debilitating cardiac condition was attributable solely to the accidental injury suffered at the fire scene; that because his

medical condition immediately prior to the accidental injury was such as did not entail any functional loss of use, Lovellette did not suffer any loss of wage earning capacity — an essential prerequisite to a successful claim for occupational disease. Although acknowledging that Lovellette was totally disabled after he suffered his myocardial infarction, the City says that the medical reports showed that "there was no disease process resulting in a loss of use within the claimant at the time of the accidental injury and thus it was the accidental injury and not the occupational disease which resulted in Lovellette's current medical state." This determination, according to the City, may be viewed either as a rebuttal of the § 64A (a) presumption or as a finding that the presumption was inapplicable.

### (2)

We have said time and again that the cardinal rule of statutory construction is to ascertain and effectuate the actual intention of the legislature. The primary source from which to determine the legislative intention is the language of the statute itself. In determining the meaning of a statutory provision, the statute must be examined as a whole and the interrelationship or connection among all of its provisions considered. More particularly, the Workmen's Compensation Act is to be construed as liberally in favor of injured employees as the Act's provisions will permit so as to effectuate its benevolent purpose as remedial social legislation. Any uncertainty in the meaning of the statute should be resolved in favor of the claimant. *See, e.g., Soper v. Montgomery County,* 294 Md. 331, 449 A.2d 1158 (1982); *Trotta v. County Car Center,* 292 Md. 660, 441 A.2d 343 (1982); *Howard Co. Ass'n, Retard. Cit. v. Walls,* 288 Md. 526, 418 A.2d 1210 (1980); *Beth.-Fair. Shipyard v. Rosenthal,* 185 Md. 416, 45 A.2d 79 (1945).

We think the decisions below and the City's argument on appeal failed to consider and fairly apply these fundamental principles of statutory construction. Nothing in the lan-

guage of § 64A (a), nor in *Colgan,* suggests that the statutory presumption of a compensable occupational disease is inapplicable where the disabling heart disease initially manifests itself, as here, in the course of a work related accidental personal injury of traumatic origin. To so construe § 64A (a) ignores its plain language, namely, that "Any [disabling] condition or impairment of [a fire fighter's] health . . . caused by . . . heart diseases . . . shall be presumed to be compensable . . . and to have been suffered in the line of duty and as a result of his employment." It is undisputed that Lovellette's disability was caused by heart disease.[6] For purposes of applying the threshold presumption of § 64A (a), it does not matter how the fire fighter contracted the disabling heart disease; it is presumptively compensable as an occupational disease. In other words, the presumption of compensability under § 64A applies without regard to the circumstances under which the heart disease, which disabled the fire fighter, first became evident. Undoubtedly, a myocardial infarction suffered by a fire fighter as a result of an unusual job related physical strain may be compensable as an accidental personal injury under § 15 of the Act. But the claim in this case was not for an accidental personal injury; it was for occupational disease benefits under § 64A, thereby triggering the rebuttable presumption of fact that Lovellette's disabling heart disease was due to the nature of his stressful employment as a fire fighter.[7]

Neither the medical board nor the Commission gave Lovellette the benefit of the presumption to which he was

---

**6.** The Court of Special Appeals erroneously concluded that there was legally sufficient evidence that Lovellette's "impairment was not caused by heart disease," but rather by the unusual strain caused by his attempt to lift the heavy door at the fire scene. No such finding was made by either the board or the Commission. Manifestly, a myocardial infarction qualifies as a heart disease within the ambit of § 64A's provisions.

**7.** Section 64A was amended by ch. 281 of the Acts of 1972 to include certain police officers within its coverage, as to heart disease and hypertension. Subsequently, amendments extended § 64A's provisions to volunteer firemen and rescue squad members, ch. 598 of the Acts of 1975; police officers of the Maryland-National Capital Park and Planning Commission, ch. 388 of the Acts of 1977; and fire fighter instructors, ch. 547 of the Acts of 1978.

entitled under § 64A (a). Rather, they denied his claim for occupational disease benefits based on an erroneous conception of the governing law, namely, that if the fire fighter's heart disease was precipitated by an accidental personal injury the occupational disease provisions of § 64A simply did not apply. Moreover, the mere fact that Lovellette's heart disease may have been the direct result of immediate sudden strenuous activity, and thus was accidental in nature, does not preclude compensability as an occupational disease under § 64A (b); that subsection awards a greater measure of compensation to fire fighters "whose compensable claim results from a condition or impairment of health caused by . . . heart diseases . . . suffered in the line of duty."

It is undoubtedly true that heart disease is not generally recognized as an occupational disease. *See* H. McNiece, *Heart Disease and the Law,* ch. 9 (1961). Indeed in *Big Savage Ref. Corp. v. Geary,* 209 Md. 362, 366, 121 A.2d 212 (1956), the Court said that "Heart trouble is not an occupational disease." That case involved an occupational disease claim for silicosis filed by a clay miner who also suffered from cardiac disease, which appeared to be the actual disabling factor. Section 64A was enacted fifteen years after the decision in *Big Savage* and it is perfectly apparent that the legislature intended that, as to fire fighters, heart disease is presumptively compensable as an occupational disease. And while it may also be true that occupational diseases and accidental personal injuries are, in general, antithetical in nature, that principle has no application to claims filed under § 64A in view of the legislature's clear intention to afford fire fighters, whose health is impaired by disabling heart disease, a presumption that the disease was work related.

Considering the explicit language of § 64A in relation to the other occupational disease sections of the Act, and concluding that the board and the Commission based their decisions on an erroneous conception of the applicable law, *see Md. Bureau of Mines v. Powers,* 258 Md. 379, 383, 265 A.2d 860 (1970), we shall remand the case in order that Lovellette

may be afforded the benefit of § 64A's rebuttable presumption of fact. Lovellette's heart disease may or may not be compensable in the ultimate analysis as an occupational disease but that determination can only be made by first applying the presumption that the disease was due to the nature of Lovellette's employment and compensable as an occupational disease. Once having applied the presumption, the Commission must then consider whether it has been rebutted by other evidence in the case showing that non-job related factors either caused or contributed, in whole or in part, to Lovellette's heart disease and, if so, apportion the contribution of each factor accordingly.[8]

> *Judgment of the Court of Special Appeals reversed; case remanded to that Court with directions to remand the case to the Circuit Court for Baltimore City for further remand to the Workmen's Compensation Commission for further proceedings in accordance with this opinion; costs to be paid by appellee, Mayor and City Council of Baltimore.*

---

**8.** It is noted that the 1980 Report of the Governor's Study Commission on Workmen's Compensation Coverage, at pages 13-14, states that a majority of the Study Commission recommended that § 64A be eliminated from the law. The report states: "A majority of the Commission stresses that the medical board must necessarily consider the causal relationship of these occupations to heart and lung diseases and hypertension. Therefore, this, or any positive presumption as to the cause of an occupational disease, is superfluous." A minority of the Study Commission favored continuation of § 64A, believing that it "should be retained due to the nature of the work and the hazards to which police and firefighters are exposed in the line of duty."