WILLIAMS *v.* McCARDELL ET AL., BOARD OF
TRUSTEES OF EMPLOYEES' RETIREMENT
SYSTEM OF BALTIMORE CITY

[No. 4, October Term, 1951.]

*Decided October 31, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*O. Bowie Duckett,* with whom was *Samuel M. Campanaro* on the brief, for appellant.

The Court declined to hear argument for the appellees. *Thomas N. Biddison, City Solicitor of Baltimore City,* and *Daniel B. Leonard, Assistant City Solicitor,* on the brief, for appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order dismissing a petition for *mandamus* commanding respondents, the Board of Trustees of the Employees' Retirement System, to approve petitioner's application for accidental disability benefits from December 11, 1948.

In 1927 petitioner, then twenty-five years old, entered the Baltimore City Fire Department. In 1938 he was promoted to the rank of Lieutenant. On December 11, 1948 he was retired by the Department as totally and permanently unfit for duty. He is a member of the Employees' Retirement System.

Section 6 of the Employees' Retirement System ordinance (Ordinance No. 553, approved February 21, 1926;

Baltimore City Code, 1927 Edition, Article 30, section 6) provides: "* * * ACCIDENTAL DISABILITY BENE-FIT (5) Upon application of a member, * * * any member who has been totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty *at some definite time and place,* without wilful negligence on his part, shall be retired by the Board of Trustees, provided that the medical board shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member shall be retired. ALLOWANCE ON ACCIDENTAL DISABIL-ITY RETIREMENT (6) Upon retirement for accidental disability a member * * * shall receive an accidental disability retirement allowance which shall consist of [a specified annuity and pension]" [Italics supplied.]

Petitioner made application for accidental disability benefits. On June 21, 1949 and September 22, 1949 his application was heard by respondents, on testimony and other evidence and arguments of counsel. On October 19, 1949 the application was denied, with a written opinion, on the ground that "the Board does not find that the incapacity of the applicant is the natural and proximate result of an accident occurring in the actual performance of duty at some definite time and place. This conclusion is based on the testimony and evidence presented to the Board and upon a consideration of the applicable authorities." Petitioner alleges that respondents' action in denying his application "is unwarranted and contrary to the applicable facts and law", and that in denying the application respondents "acted capricious-ly, arbitrarily, illegally and unreasonably * * *". The application for mandamus was heard on the testimony and other evidence before the Board. The petition was dismissed on two grounds, stated in Judge Tucker's opinion, [1] "There was very substantial evidence before the Board of Trustees of the Retirement System to sup-port their decision that the incapacity of the petitioner

was not the natural and proximate result of an accident; and for that reason alone their decision may not be disturbed by the court." [2] "There is another reason, however, that the petitioner may not obtain the relief for which he has prayed. The contention of the petitioner, which, he claims is supported by the testimony of his witnesses, Doctors. Skolnick and Serra, is that during his 21 years of services in the Fire Department he sustained various injuries, some of which were accidental, and was subjected to considerable responsibility in protecting property and the lives of people, and it was the combination of these events and conditions that caused his eventual incapacitation. But, even if this contention were supported by uncontradicted evidence it would not entitle the petitioner to the special benefits under the above provisions of the ordinance, because the incapacity would not be the result of 'an accident occurring * * * at some definite time and place'. * * * There is no substantial evidence to show that the petitioner's incapacity resulted from 'an accident at some definite time and place'." Judge Tucker held that by the ordinance "the cause of incapacity is limited to one accident at a definite time and place".

Petitioner's disability is due to coronary thrombosis. Petitioner contends this was caused—or aggravated— by accident; respondents contend it was not, and could not be, caused by accident. The Board "does not find" that it "is the natural and proximate result of an accident occurring in the actual performance of duty at some definite time and place". Judge Tucker holds that [1] "There was very substantial evidence before the Board * * * to support their decision" that it was not the natural and proximate result of an accident and [2] "there is no substantial evidence" that it resulted from one "accident at some definite time and place".

Petitioner testified to four "accidents" in the performance of duty, on October 20, 1928, January 18, 1940, August 28, 1942, and December 6, 1948, and six occasions, on April 22, 1942, January 9, 1943, February 12, 1943,

November 17, 1948, November 29, 1948 and December 11, 1948, when he was examined (and in five of these instances went off duty) on account of pains in the chest or the chest and back. He offered the testimony of one physician and a letter from another. Dr. Skolnick, medical consultant of the International Fire Fighters Association, testified, "It is my opinion based on evidence as I heard it today that Lieutentant Williams has now a heart condition resulting from the accidental nature of his fire fighting duties"; that the exertion and excitement which petitioner testified to in connection with the various occurrences mentioned could produce the results which the doctors in their report had stated had been reached; "I feel that his final condition of heart disease is the result of his fire fighting duties"; "Under discussion today I am chiefly concerned as to how his heart disease came about * * *"; "I began a study in 1936, and continuing through 1945 when I wrote a conclusion based on that compilation that there were three, possibly four, important factors responsible for heart disease in fire fighting duties. I list those as follows: 1. The effects from smoke with or without asphyxiation depending upon the severity. 2. The stresses and strains of an unusual nature. Now in stresses and strains we can sub-divide that in various ways. It is not generally known among the population that a fireman can be under terrific stress and strain, when a non-fireman or a layman is in his mode of relaxation. I can explain it this way. There is no guarantee that in fighting fires, in fire fighting duties, that once a fireman returned from any type of fire— let's assume it is a severe strain—he is not called upon to return to another fire of equal or greater strength. That is what we call the emergency response. That is required only in fire fighting, hardly any other profession. Then another factor are those factors of stresses and strains on a heart that is already weakened by previous experience. As I sat and listened to this recitation of these various symptoms that Lieutenant Williams complained of, it just emphasized the fact that here was

an individual, a fireman, who during certain periods of his fire fighting duties was re-injured, so to speak, during those times, and especially during those times when he complained of, as he described it, when his duties included straining and smoke and things of different natures. In other words, it might appear to the Board questionable as to why did Lieutenant Williams in 1948 suddenly become disabled. It is my contention that that disability that Lieutenant Williams has been finally, and I also believe correctly, described as a disability, is a complete and final disability, had also existed in other forms, in possibly a less severe form in his previous years of fire fighting. We could be sitting here in 1943 under the same conditions that we are now sitting here in 1949, in which we could be discussing the same problem. It just so happens that Lieutenant Williams' physical condition was undiagnosed until 1949 or '48. * * * So the problem doesn't change. We are today describing a condition that was first diagnosed as heart disease in 1948, although I feel sure it had existed because of fire fighting duties from his other incidents, especially the tirade of incidents of the '42-'43 period, and that we are now talking about a man who finally comes to our attention with a medical acknowledgement that he has heart disease, and should not fight any more fires." When questioned by Dr. Williams, a member if the Board, he testified that you could get the same coronary thrombosis as reported by the doctors without any fire fighting experience whatsoever. Dr. Serra, in a letter, said, "It is well known that emotional upheavals in the nature of anger or fear seem to predispose to the development of this condition. However, it is impossible to say, unequivocally, that the various stresses associated with the occupation of firemen were the basic causative factors in this case, and by the same token it is possible that the severity and frequency of the attacks may have been aggravated by them. Realizing that this condition is not uncommonly seen in individuals who are subjected to considerable responsibility, one may well

contend that being a lieutenant, he had the responsibility of protecting property and the lives of his men and this may have played a part in the development of his illness. This is a fact which cannot be proven or disproven readily."

Respondents offered the testimony of five physicians. Dr. Carey testified that "diagnosis of coronary thrombosis is said by the patient to have been established firmly at West Baltimore General Hospital. There is, however, no evidence of correlation with any of his past history. In my opinion, none of the injuries sustained by the patient during his career as a fireman could have caused coronary thrombosis."; the clot formation in coronary thrombosis "is thought to be caused by arteriosclerosis"; what is the cause of arteriosclerosis "no one knows". Dr. Wright, one of the Board's physicians, when asked whether in his opinion "one, any or all" of the accidents described by petitioner were "the natural and proximate cause of his physical condition today", testified, "I should say they are not the cause". He also testified, "I don't believe the coronary thrombosis is due to any particular accident" or the sum total of the accidents. "I think coronary thrombosis is a result of the wear and tear of living. The sum total of everything we have experienced in the past altogether, and we end up by being what we are at a certain time and if it happens to be coronary thrombosis, that is it. I don't believe you put it on any one or two or half dozen accidents of any kind." Dr. Vollmer, one of the Board's physicians, testified that on the basis of petitioner's testimony it cannot be said on medical grounds that petitioner's coronary thrombosis is the natural and proximate result of one, any or all of the accidents described in his statement; "actually coronary thrombosis or coronary heart disease is an aging process which occurs gradually over a period of time. Thrombosis is usually a sudden occurrence, but is usually indicates years of slowly progressing sclerosis of the coronary vessels prior to the actual thrombosis." Dr. Ogden, a Fire Department physician, testified that,

in his opinion, after consulting cardiologists, looking at a good many papers, practising for a good many years, and listening to papers read two years ago at the American Medical Association, "there is absolutely no evidence proving to me that accident has anything to do with coronary artery disease". "Coronary artery disease is due to arteriosclerosis. Arteriosclerosis, just like cancer, just like nephritis, just like rheumatoid arthritis all are conditions that we do not know the cause. No cause has been found for any of these devastating conditions, but we do know that they have no relation to accident." "I say this, that if this condition is caused by exercise, any death that we die of can be caused by exercise." Dr. Lloyd, a Fire Department physician, testified that it is his opinion that the accidents and conditions petitioner had prior to his retirement "had nothing whatever to do with his heart condition or with the coronary artery disease"; his list of accidents and mishaps, he does not think, could have had anything to do with his present heart condition; "It has been testified to here by other doctors arteriosclerosis is not brought about by accidents, violence. It is a natural cause that comes on gradually."; strenuous exercise "wouldn't cause arteriosclerosis in my opinion"; it was his opinion that fire fighting, inhalation of smoke and strenuous exercise "do not cause arteriosclerotic heart disease".

It would be very difficult, to say the least, to find evidence legally sufficient to support a finding that petitioner's disability was caused by accident, one or many, any or all. Dr. Skolnick's somewhat speculative testimony seems to indicate, at most, that coronary thrombosis may have been caused, not by accident, one or many, any or all, but by the sum total of the stress and strain of "his fire fighting duties", *i. e.,* that coronary thrombosis is an occupational disease of firemen—as well as business executives, physicians and lawyers. This is a question we need not decide. Undobutedly there is, as Judge Tucker says, "very substantial evidence" to support the finding that it was not caused by accident, one

or many, any or all. *Heaps v. Cobb,* 185 Md. 372, 378-379, 385, 45 A. 2d 73. In the *Cobb* case the Board's finding was not merely against the weight of the evidence but contrary to the undisputed facts. The case was one of the infrequent cases in which, in an ordinary action at law, a verdict should have been directed for the plaintiff. *Sonnenburg v. Monumental Motor Tours,* 198 Md. 227, 236, 81 A. 2d 617, 621.

Petitioner relies on decisions of this court "that an injury may be accidental even though the conditions which caused it extended over a considerable period of time" *Foble v. Knefely,* 176 Md. 474, 487, 6 A. 2d 48, 53, 122 A. L. R. 831, citing *Victory Sparkler Co. v. Francks,* 147 Md. 368, 128 A. 635, 44 A. L. R. 363, and similar decisions in other states. "Nor can the fundamentally accidental nature of the injury be altered by the consideration that the infection was gradual throughout an indefinite period, * * * or that, instead of a single accidental injury, there was a succession or series of accidental injuries culminating in the same consequential results." *Victory Sparkler Co. v. Francks, supra,* 147 Md. 380, 128 A. 639. In the *Victory Sparkler* case the accidental injury was phosphorus poisoning through inhalation of phosphorus fumes; in *Foble v. Knefely* it was inflammation and bruising of the knee "by the steadily recurrent pressure" of a knee press on a machine used by the injured employee. In both cases the court distinguished between occupational disease and accidental injury and held that the latter does not include the former.

It is not necessary to decide whether, as Judge Tucker holds, by the ordinance "the cause of incapacity is limited to *one* accident at a definite time and place". [Italics supplied.] As we have said, Dr. Skolnick seems to ascribe petitioner's "heart disease" not to any or all of his four "accidents", but to the sum total of "his fire fighting duties". The Board's finding is supported by "very substantial evidence" that it is not due to accident, with or without other fire fighting duties. The Board's find-

ing is in the words of the ordinance. We cannot, in order to set the finding aside, assume that in the finding "an accident" is limited to one accident at a definite time and place, and then hold that in the ordinance the same words are not so limited. This is particularly true in view of the ample evidence to support the Board's finding whether "an accident" is limited to one accident or not.

In *Geipe, Inc. v. Collett,* 172 Md. 165, 169-170, 190 A. 836, 839, 109 A. L. R. 887, also relied upon by petitioner, a cerebral hemorrhage and paralysis, caused by seeing a man jump in front of a truck, was held to be an "accident", though the injured person was suffering from high blood pressure and hardening of the arteries, and "if he had suffered a stroke of paralysis while napping and resting at Wilmington, or while uneventfully driving to Baltimore, a paralysis occurring would have been a natural and probable result of his impaired physical health, and so would have possessed none of the essentials of an accidental happening. * * * The claimant was precipitated into paralysis as the result of the accident." In the instant case petitioner was not "precipitated into", and his disability was not caused by, an acute coronary attack caused by accident.

The *Victory Sparkler* case was decided on February 12, 1925; the ordinance was approved on February 21, 1926. We should hesitate to hold that the words "at some definite time and place" have no meaning at all and no effect in limiting the scope of the word "accident". No case has been cited, and we have found none, in which the words of the ordinance have been construed. For present purposes only, we may assume that these words add or subtract nothing, since there is "very substantial evidence" that disability was not caused by one or many accidents.

Petitioner contends that respondents' action was arbitrary and capricious and should be set aside. He stresses the fact that the Board mentions ten cases cited by him (also cited in this court) without any discussion of them

beyond the statement that its conclusion is "based on the testimony and evidence" and upon a consideration of the applicable authorities. Not infrequently courts, high and low, make such a disposition of authorities cited, though seldom or never to the satisfaction of counsel who cite them. Action of an administrative board may be arbitrary or unlawful because facts found are unsupported by evidence or conclusions drawn are contrary to law or facts. Sometimes the opinion of the board, or even testimony of its members *Benner v. Tribbitt,* 190 Md. 6, 18, 57 A. 2d 346, may show or tend to show that its action was arbitrary or unlawful. *West v. Chesapeake and Potomac Telephone Company,* 295 U. S. 662, 55 S. Ct. 894, 79 L. Ed. 1640; *Capital Transit Company v. Bosley,* 191 Md. 502, 62 A. 2d 267. But ordinarily courts are concerned with results rather than methods. They review the action, not the opinion, of the board. They cannot set aside findings of facts supported by substantial evidence merely by calling such findings "arbitrary".

Petitioner contends that the court was in error in denying him a jury trial on the ground that he had failed to pray a jury trial within the time prescribed by a rule of court. As the evidence presents no issue of fact to be submitted to a jury, error, if any, in denying a jury trial was not prejudicial.

*Order affirmed, with costs.*